**SIERRA CLUB; The Wilderness Society; Georgia Forestwatch, Inc.; The Amurchee Alliance; The Rabun County Coalition to Save the Forest, Inc.; and Friends of Georgia, Inc., Plaintiffs,**

v.

**George MARTIN, in his official capacity as Forest Supervisor of the Chattahoochee and Oconee National Forest; Robert C. Joslin, Regional Forester of the United States Forest Service for Regional Eight; and United States Forest Service, Defendants,**

v.

**Bert Thomas; Cook Brothers Lumber Co., Inc.; Parton Lumber Co., Inc.; and Thrift Brothers Lumber Co., Inc., Intervenors.**

No. Civ.A.196CV926FMH.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 17, 1996.

Donald D. J. Stack, Stack & Associates, Atlanta, GA, Eric Eugene Huber, Earthjustice Legal Defense Fund, Inc., New Orleans, LA, for Plaintiffs.

James Randolph Schulz, Office of U.S. Atty., Northern District of Georgia, Atlanta, GA, Lois J. Schiffer, phv-USDOJ, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Enforcement Section, Washington, DC, Kelly E. Mofield, phv-DOJ, Stephen R. Herm, phv-USDOJ, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Lisa A. Holden, phv-DOJ, U.S. Department of Justice, Environment & Natural Resources Division, General Litigation Section Washington, DC, for Defendants.

### ORDER

HULL, District Judge.

This matter is before the Court on the Plaintiffs' Motion for a Preliminary Injunction [3–1, 3–2] seeking to enjoin the timber cutting of 2,103 acres in the Chattahoochee and Oconee National Forests in Georgia. After reviewing the record in its entirety and hearing oral arguments of counsel for the parties, the Court hereby GRANTS Plaintiffs' Motion for a Preliminary Injunction [3–2] and finds as follows.

## I. *FINDINGS OF FACT*

### A. Parties

**1.**

The Defendant United States Forest Service ("Forest Service") has authorized

seven timber projects which allow private parties to purchase and cut timber in the Chattahoochee and Oconee National Forests in Georgia (the "National Forests" or "Forests"). These timber sales allow timber cutting, logging, clearcutting, road building, and related activities for seven timber sale areas in the Chattahoochee and Oconee National Forests (the "timber sale areas").

2.

Defendant George Martin is the Forest Supervisor of the Chattahoochee and Oconee National Forests. Defendant Robert C. Joslin is the Regional Forester of the United States Forest Service for Region Eight. These Defendants are the two officials of the Defendant Forest Service who performed or are responsible for the agency actions Plaintiffs challenge in this case.

3.

The Plaintiffs are environmental membership organizations with members who are adversely affected by the Defendants' actions. Plaintiffs' members lead numerous recreational trips into the Chattahoochee and Oconee National Forests each year.

**B. Procedural History**

4.

On April 17, 1996, Plaintiffs filed their Complaint and Motion for Temporary Restraining Order and Preliminary Injunction.

5.

On April 19, 1996, the Plaintiffs and Defendants, by consent, stipulated to a twenty-day temporary cessation of all tree cutting, logging, and roadmaking for the eight timber sales in the seven project areas in the National Forests. In lieu of the Court's granting a Temporary Restraining Order, the Plaintiffs and Defen-

dants consented to this twenty-day temporary cessation of activities, and the Court scheduled a hearing for May 1, 1996 on Plaintiffs' Motion for a Preliminary Injunction.

6.

On May 1, 1996, the Court reviewed the evidence with the parties and heard oral argument on Plaintiffs' Motion for a Preliminary Injunction. On May 8, 1996, this Court entered an Order granting Plaintiffs' Motion for Preliminary Injunction based on Defendants' violations of the Migratory Bird Treaty Act. In that Order, the Court enjoined the timber cutting in the seven timber project areas in issue during the nesting season of the migratory birds. At that time, Plaintiffs also requested an injunction beyond September 15, 1996 based on Defendants' alleged violations of the Clean Water Act and the National Forest Management Act. In the May 8, 1996 Order, the Court did not reach those issues, but requested further briefing and oral argument.

7.

On June 17, 1996, the Court granted Motions to Intervene filed by timber contractors Bert Thomas, Cook Brothers Lumber Co., Inc., Parton Lumber Co., Inc., and Thrift Brothers Lumber Co., Inc. (the "Timber Contractors"), who had entered into the timber sale contracts with the Defendants.

8.

On July 11, 1996, the Court heard additional oral argument regarding whether Defendants' approving these timber sale contracts violates the Clean Water Act, the National Forest Management Act, and the National Environmental Policy Act. This Order addresses these remaining issues.

**C. Intervenor Timber Contractors**

9.

The Defendant Forest Service's seven timber sale projects involve approximately 2,103 acres of forest to be harvested, including logging by clearcutting.[1] The tim-

---

1. The seven timber projects actually include

eight timber sales contracts because the De-

ber projects in the National Forests involve "below-cost" timber sales, in which timber in the National Forests is sold for prices that do not cover the costs to the Forest Service, including the cost of making the sale and reforestation afterwards.

10.

Although contracts on four projects have been awarded, timber harvesting and road building activity have begun on only three of these seven timber projects.

11.

Applicant Bert Thomas ("Thomas") purchased two timber contracts awarded by the Defendant Forest Service, namely the Big Net Timber Project and the Upper Swallows Timber Project. Mr. Thomas had started harvesting timber on both projects when operations were suspended voluntarily on April 19, 1996 and later enjoined on May 8, 1996.

12.

The third project, Compartment 05 Timber Project, was divided into two contracts. Applicant Cook Brothers Lumber Co., Inc. ("Cook Brothers") purchased the Hanging Rock 2, Compartment 05 Timber Project from the Defendant Forest Service. Cook Brothers had commenced harvesting when operations were suspended voluntarily on April 19, 1996 and later enjoined on May 8, 1996. Road building, but no timber harvesting, has begun on the second contract in the third timber project. Applicant Parton Lumber Co., Inc. ("Parton") purchased the Hanging Rock 1, Compartment 05 Timber Sale from the Defendant Forest Service. Parton had commenced road construction on the project before operations were suspended voluntarily on April 19, 1996 and later enjoined on May 8, 1996.

13.

A fourth timber project has been sold, but has not yet been implemented. Applicant Thrift Brothers Lumber Co., Inc. ("Thrift Brothers") purchased the Compartment 59 Timber Sale from the Defen-

dant Forest Service. Thrift Brothers had not commenced operations at the time the Court entered its May 8, 1996 Order.

14.

Three remaining timber projects, South Corn Ridge, Dunaway Gap, and Tibbs Trail, have been approved by the Defendant Forest Service, but have not yet been offered for sale by Defendants.

15.

The logging and road building at issue include cutting of hemlock-cove hardwoods and stands with advanced age, over ninety years, that are increasingly rare in the highly modified landscapes in North Georgia.

16.

The timber projects involve the discharge of 275.2 tons of sediment into rivers and streams in the National Forests. This discharge results from the harvesting of the timber and does not include the discharge from the roads built during the projects.

17.

The seven timber projects involve building 18 miles of road in wilderness areas of the National Forests. Some roads are permanent and others are temporary. An additional 155.1 tons of sediment will be discharged to the river and streams from the roads alone.

**D. Chattahoochee and Oconee National Forests**

18.

The Chattahoochee National Forest sits on 741,400 acres at the southernmost reaches of the Appalachian Mountains. Visitors from throughout the Southeast come to enjoy outdoor activities in the Forest, which encapsulates a significant portion of the North Georgia Mountains. The Chattahoochee National Forest contains 19,000 acres of lakes and 1,500 miles of perennial streams used by trout. Water yield averages about 2,160,000 acre-feet

---

fendant Forest Service sold two separate timber contracts in the Compartment 05 Project

Area, i.e., the Hanging Rock 1 Sale and the Hanging Rock 2 Sale.

per year, or 2.9 feet per acre of land. While the Forest attracts a number of urban dwellers, it is also valued for its timber resource. Hardwood and softwood timber is logged to mills in the area.

19.

The Oconee National Forest is 104,420 acres located in the rolling terrain of the Georgia Piedmont. Only a few decades ago, these lands were eroding and abandoned cottonfields. Today the land has been returned to productive use. However, soil restoration projects still are implemented to eliminate gullies and similar problems that remain from the past. The Forest contains about 34,000 acres of lakes and 240 miles of perennial streams, used by large-mouthed bass and bream. Water yield averages 115,000 acre-feet per year, or 1.2 feet per acre of land. The Oconee is well know for its deer hunting, and Lake Oconee has become a popular recreational attraction. Timber also plays a major role in the Oconee. While the Oconee is one-seventh the size of the Chattahoochee, the Oconee supplies one-third of the timber harvested annually in both Forests.

## E. The Land and Resource Management Plan for the Chattahoochee and Oconee National Forests

20.

The National Forest Management Act ("NFMA") requires the Defendant Forest Service to develop and maintain a forest management plan for each unit of the National Forest System. 16 U.S.C. § 1604(a). The forest management plan must develop objectives for the forest unit consistent with the mandate of the Multiple–Use Sustained Yield Act of 1960, 16 U.S.C. §§ 528–531. Under the NFMA and the regulations promulgated thereunder, the forest management plan must provide for a diversity of plant and animal species within the forest unit, must provide measures that insure that fish and wildlife habitants are managed to maintain viable populations of existing native and desired non-native vertebrae species in the area, and must provide for timber harvesting in the forest unit.

21.

In 1985, the Defendant Forest Service implemented the Land and Resource Management Plan ("the Forest Plan") for the Chattahoochee and Oconee National Forests. As directed under the NFMA, the Forest Plan contains multiple objectives for recreational uses for the Forests, for maintaining a diversity of plant and animal species in the Forests, for maintaining the viability of existing native and desired non-native vertebrae systems in the Forests, and for timber yield from the Forests. The Defendant Forest Service is currently managing the Chattahoochee and Oconee National Forests under the 1985 Forest Plan, and the Amendments thereto.

## F. Proposed, Endangered, Threatened, and Sensitive ("PETS") Species

22.

The Defendant Forest Service identifies certain animal and plant species in the Forest as proposed, endangered, threatened, and sensitive species ("PETS"). All parties agree that many plants and animals identified by Defendants as "sensitive species" occupy the seven timber project areas and that a few "endangered species" also occupy the seven timber project areas. All parties also agree that the wildlife habitats in these seven timber project areas are suitable for many "sensitive species" of plants and animals and for some "endangered species."

23.

The regulations promulgated under the NFMA direct that the Defendant Forest Service shall maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure that its continued existence is well distributed in the planning area. Further, the NFMA also directs that habitat determined to be critical for threatened and endangered species shall be identified, and that measures be prescribed to prevent the de-

struction or adverse modification of such habitat. Objectives shall be determined for threatened and endangered species that shall provide for, where possible, their removal from listing as threatened and endangered species through conservation measures.

24.

The Forest Service Manual defines "sensitive species" as those plant and animal species, identified by a Regional Forester, for which population viability is a concern as evidenced by significant current or predicted downward trends in population numbers or habitat capability as follows:

2670.5—Definitions.

19. Sensitive Species. Those plants and animal species identified by a Regional Forester for which population viability is a concern, as evidenced by:

a. Significant current or predicted downward trends in population numbers or density.

b. Significant current or predicted downward trends in habitat capability that would reduce a species' existing distribution.

Forest Service Manual § 2670.5(19). The Forest Plan also defines sensitive species as a species with special habitat needs that may be influenced by management programs. Plan FEIS, at 8–32.

25.

Under the NFMA's regulations, the Defendant Forest Service is required to pay

Rough Sedge
Witch Hobble
Yellow Lady's Slipper
Pink Lady's Slipper
Large Whorled Pogonia
Diana Fritillary
Masked Shrew
Pygmy Shrew

28.

The following species of plants and animals, admitted by Defendants to be "sensi-

Peregrine Falcon

special attention to "sensitive" species. Hence, the Forest Service Manual instructs that Defendants' activities in the National Forests should "avoid or minimize impacts to species whose viability has been identified as a concern." Forest Service Manual § 2670.32(3). Also the Forest Plan for these two National Forests incorporates the Vegetation Management Environmental Impact Statement for the Appalachian Region, which requires the consideration of adequate population data for endangered and sensitive plant species whenever there is a high likelihood of occurrence on the project site.

26.

The Endangered Species Act defines "endangered species" as "any species which is in danger of extinction through all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming risk to man." 16 U.S.C. § 1532(4).

27.

The following species of plants and animals, admitted by Defendants to be "sensitive" or "endangered" species, were found in at least one, and often several, of the timber project areas in the Chattahoochee and Oconee National Forests:

Brook Trout
Snowy Hydrangea
American False Hellebore
Small Purple Fringed Orchid
Cerulean Warbler
Manhart's Sedge
Ruth's Sedge
Cherokee Clubtail Dragonfly

tive" or "endangered" species, likely occur or potentially occur in almost all of the timber project areas because the habitats therein are suitable for these species:

Southern Appalachian Cottontail Rabbit

Green Salamander
Small Whorled Pogonia
American Ginseng
Turkeybeard
Southern Shrew
Northern Pine Snake
Rafinesque's Big–Eared Bat
Large Flowered Skullcap

Common Raven
Mountain Maple
Red Elderberry
Rosy Twisted Stalk
Fort Mountain Sedge
Golden Seal
Trispot Darter
Holiday Darter
Blue Shiner

## G. Environmental Impact Statement

### 29.

Federal agencies must prepare an Environmental Impact Statement ("EIS") for any major federal action significantly affecting the quality of the human environment. In order to determine whether an EIS is required, federal agencies first prepare an Environmental Assessment ("EA") to determine whether the proposed federal agency action does or does not have significant impact. The Defendant Forest Service prepares EAs analyzing each proposed timber project, and then issues decisions with a "Finding of Significant Impact" or a "Finding of No Significant Impact" ("FONSI"). In preparing the EAs, the Defendant Forest Service also prepares Biological Evaluations ("BE") for each timber project area.

### 30.

The seven separate EAs prepared by the Defendant Forest Service for these seven timber projects each concluded that the timber projects had no significant impact on the sensitive or endangered species in the project areas. The Defendant Forest Service issued seven separate decisions with FONSIs. As a result, no Environmental Impact Statements were prepared for these seven timber projects.

### 31.

Plaintiffs contend the BEs and EAs were prepared without any current population data, inventory data, population trend analysis, and without adequate investigation and information, and that therefore, the Defendant Forest Service's FONSI decisions are arbitrary, capricious, and contrary to law. The Court first discusses the methodology used by the Defendant Forest Service in preparing the BEs and EAs

and then outlines the BEs and EAs for each of the seven timber projects.

## H. Biological Evaluations and Environmental Assessments

### 32.

Before approving a timber project, the Defendant Forest Service conducts a BE and prepares an EA to determine the impact of the timber project on any "sensitive" and "endangered" species in the timber project area. In completing the BE, a Forest Service staff member (typically a biologist) first develops a list of any sensitive or endangered species that exist or potentially exist in a timber project area. Field surveys are conducted to determine the existence of sensitive and endangered species on the project site. The field surveys for the BEs in issue are in the administrative record. The biologist normally does not count or inventory the number of any given sensitive or endangered species in the project area or gather baseline population data in the field survey. The survey is simply a field trip to the project site to determine what types of species of plants and animals may exist in the part of the project area visited.

### 33.

The staff member also examines whether the project area is a suitable habitat for any potential sensitive or endangered species. If the staff member concludes that the project area does not provide suitable habitat for the sensitive and endangered species, and that there is no record of such species in the project area, and if such species are not observed during the field survey, the staff member concludes that the project likely would not affect any sensitive and endangered species.

**34.**

If any sensitive or endangered species for that National Forest has been observed in the project area or if the project site has suitable habitat for any sensitive or endangered species identified for that particular National Forest, the staff member is required to evaluate the effects of the proposed timber sale on that sensitive or endangered species.

**35.**

As outlined in more detail below, Defendants' BEs show that numerous sensitive and endangered species of plants and animals exist in the seven timber project areas and that the habitats in the seven timber projects are suitable for many sensitive and endangered species in these two Forests. The issue in this case is not whether the sensitive and endangered species occur in the seven timber project areas or whether the habitats are suitable for certain sensitive and endangered species in the seven timber project areas. Instead, the issue is whether the timber projects by destroying individual populations of sensitive species in the project area and destroying suitable habitats for potential sensitive and endangered species "significantly impact" those sensitive or endangered plants and animals in these Forests.

**36.**

Since Defendants designated the plants and animals in issue as sensitive species, *a fortiori* Defendants acknowledge that their population viability is a concern due to significant current or predicted downward trends in habitat capability, in population numbers, and population density. However, in making the determination whether these timber projects have a significant impact on viability of these previously designated sensitive species, Defendants admit (a) that they conducted no current on-site population data or inventory of these sensitive species in the timber project areas, but just field-surveyed for their presence; (b) that they have no past or current population data or inventory of these sensitive species in any other areas or ranger districts in the Chattahoochee and Oconee National Forests; (c) that as a result, they have no past or current baseline population data for these sensitive species in these two Forests (whether by project area, compartment, ranger district, or forest-wide); (d) that as a result, they conducted no current population trend analyses (whether by project area, compartment, ranger district, or forest-wide) for these sensitive species in these National Forests to evaluate the impact of destroying both the individual sensitive plants and animals in these project areas and the suitable habitat for other potential members of that species in these project areas; and (e) that they do not have and did not consult any outdated population data or population trend analysis for these sensitive species in these National Forests.[2]

**37.**

Plaintiffs sent Defendants a FOIA request asking for any documents reflecting population trend data for certain sensitive and endangered species existing or with potential habitat existing in the Chattahoochee and Oconee National Forests. The Defendant Forest Supervisor Martin replied that Defendants did not have population data on 32 of the 37 sensitive species listed and did not have any population trend analysis for any of the 37 sensitive species listed.

**I. Environmental Assessments and MIS Concept**

**38.**

Once the BE for a particular timber project is completed, its results are usually

---

**2.** From time to time, the administrative record, especially the BEs therein, contain reference to a survey being made; however, again, this refers to a field trip to the project area to determine which types of plant and animals exist in a given area and not a quantitative survey or a quantitative inventory gathering population data or population trends of any given plant or animal.

reported in the EA for the timber project. In preparing the EA, the Defendant Forest Service creates an interdisciplinary team to address issues pertinent to the proposed timber project. However, in assessing the impact of the timber project on sensitive and endangered species, the Forest Service interdisciplinary team relies principally on two items: (a) the BE; and (b) the "MIS" concept.

39.

The Management Indicator Species concept, known as the "MIS concept," is a methodology by which the Defendant Forest Service manages wildlife habitats. The MIS is a wildlife management scheme in which the welfare of a selected species is presumed to indicate the welfare of other species. A specific plant or animal is selected to represent a particular ecological niche because of its habitat needs. In the MIS concept, the Forest Service selects a particular species based on its required habitat and other factors, such as food needs and whether it is hunted. The selected species becomes an MIS species. Each selected MIS species represents a large group of other species with similar habitat requirements. Once selected, each MIS species purportedly represents numerous other species with similar habitat requirements. Some MIS species also represent other species regarding other activities that occur in the Forest. For example, the White–Tailed Deer, one of the MIS species, represents other species that share the same habitat requirements and that are also hunted.

40.

The Forest Service studies the estimated effects of proposed management activities on the MIS species. Once these effects are analyzed, the Forest Service develops an idea about what effects the proposed management action has on the habitat of the MIS species. Once the Forest Service has developed estimates regarding the effects on the habitat of the MIS species, the Forest Service uses those estimates and projects what effects the proposed management

objective has on all other species that have similar habitat requirements to that of the MIS species. Thus, the effects on the MIS species are thought *to estimate* what effects each proposed management action has on the habitat of a large group of represented species and *a fortiori* the represented species themselves.

41.

The 1985 Forest Plan selected Management Indicator Species for the Chattahoochee and Oconee National Forests. Plan FEIS, at 3–21, Table 3–8. The MIS species chosen were the Deer, Bear, Turkey, Grouse, Quail, Squirrel, Bog Turtle, Yellow Lady's Slipper, Mountain Pitcher, (Brook, Brown, and Rainbow) Trout, Red–Eye Bass, Turquoise Darter, Yellow Fin Shiner, Coosa Darter, Pileated Woodpecker, Indigo Bunting, and representative PETS species. The MIS species have been altered slightly since 1985. The current MIS species for these Forests are (1) the White–Tailed Deer, (2) Black Bear, (3) Wild Turkey, (4) Ruffed Grouse, (5) Yellow Fin Shiner, (6) Dusky Salamander, (7) Bobwhite Quail, (8) Eastern Gray Squirrel, (9) Brook Trout (sensitive), (10) Brown Trout, (11) Rainbow Trout, (12) Red–Eye Bass, (13) Turquoise Darter, (14) Yellow Lady's Slipper (sensitive), (15) Bog Turtle (endangered), (16) Mountain Pitcher Plant, (17) Indigo Bunting, (18) Pileated Woodpecker, (19) Coosa Darter, and (20) Red–Cockaded Woodpecker (endangered).

42.

Together, the twenty MIS species represent six stages of succession, or the gradual replacement of one plant community by another; five special habitats or habitat components; and four sensitive or endangered species. Plan FEIS, at 3–22, Table 3–9. From these current twenty MIS species, the EAs select a certain number of the species on the MIS list and designate them as the project MIS for a particular timber project.

**43.**

Under the MIS concept, each of the 2,000 plants and 500 animal species in the Chattahoochee and Oconee National Forests shares similar wildlife habitat needs. with one or more of the twenty MIS species selected for these National Forests. The Defendant Forest Service examines whether the results of the proposed timber project will maintain, increase, or decrease the type of wildlife habitat needed by the MIS species.

**44.**

In sum, the Forest Service relies on the BE and EA for determining the impact of a timber project on sensitive and endangered species and their habitats. The separate BEs and EAs for all seven timber projects concluded that each timber project would have no significant impact on sensitive or endangered species. The Court thus examines each of the Forest Service's BEs and EAs that resulted in "Findings of No Significant Impact" and approval of these seven timber projects: (1) the Compartment 05 Timber Project, (2) the Big Net Timber Project, (3) the Tibbs Trail Timber Project, (4) the Upper Swallows Timber Project, (5) the South Corn Ridge Timber Project, (6) the Johns Mountain/Dunaway Gap Timber Project, and (7) the Compartment 59 Timber Project.

**J. Compartment 05 Timber Sale**

Compartment 05 of the Chattahoochee and Oconee National Forests is 1,583 acres located approximately twelve miles northeast of Clayton, Georgia in the Big Creek drainage in the Chattooga River Watershed. The compartment is bounded to the east by Cedar Cliffs, on the west by Highway 28 and private lands, and on the north by the Nantahala National Forest. The timber project involves logging of 799 acres in the Chattooga River Basin in Compartment 05, plus 5.3 miles of road to be built. It proposes the discharge of 77.7 tons of sediment into Big Net Branch, Corbin Creek, Big Creek, Double Bridge Creek, Owen Branch, Little Creek, Old Camp Branch, Pin Mill Branch, and Ross

Field Branch. Approximately 63.6 tons of sediment come from the road.

On February 9, 1993, the District Ranger for the Tallulah Ranger District issued notice of the proposed "Compartment 05 Timber Sale." The Forest Service often proposes four or five alternatives regarding each timber project including a "no-action" alternative and three or four alternatives with different proposed stands in a compartment to be logged and different methods of logging (such as clearcutting, shelterwood cutting, thinning, even-aged management, etc.). In this Order, the Court outlines only the BE and EA's findings about the respective alternative ultimately selected for each of the seven timber projects.

**1. *Biological Evaluation***

On December 17, 1993, the Forest Service released the BE for the Compartment 05 Timber Project. The BE identified the impacted sensitive or endangered species for Compartment 05 as: (1) the Small Whorled Pogonia, (2) the Pink Lady's Slipper, (3) Northern Pine Snake, (4) Rafinesque's Big–Eared Bat, (5) the Diana Fritillary, (6) the Peregrine Falcon, (7) the Snowy Hydrangea, (8) the Witch Hobble, (9) the Green Salamander, (10) the Southern Appalachian Cottontail, (11) the Yellow Lady's Slipper, (12) the Raven, (13) the Cerulean Warbler, (14) the Masked Shrew, and (15) the Pygmy Shrew.

**a. Small Whorled Pogonia (Endangered)**

The BE describes the Small Whorled Pogonia orchid as a Federally Endangered Species. The BE states that the Small Whorled Pogonia has been found in nine locations in the Chattahoochee National Forest, including this Tallulah Ranger District, which contains the Compartment 05 Timber Project. The BE acknowledges that the Small Whorled Pogonia occurs in a variety of habitats and that *"further studies are needed to delineate the specific habitat needs of this species."* (Emphasis

supplied). Because no Small Whorled Pogonias were found on the project site, the BE concluded that there would be no adverse effects on this species. Although no Small Whorled Pogonias were found on the site, the implication of the BE is that the site for the timber project is a suitable habitat for potential Small Whorled Pogonia, especially since other Small Whorled Pogonias have been found in the same ranger district as Compartment 05. The BE does not address the effects of the destruction of the potential suitable habitat on this endangered species.

### b. Pink Lady's Slipper (Sensitive)

The BE noted that the Pink Lady's Slipper is common throughout the Chattahoochee National Forests. Hundreds of the Pink Lady's Slipper were found within Compartment 05. The Pink Lady's Slipper is listed as "Unusual" by the State of Georgia due to the threats to its viability caused by collection of the Pink Lady's Slipper for private gardens and for medicinal purposes. *The BE acknowledged that "there is little documentation of the effects of timber management activities on Pink Lady's Slipper."* Thus, the BE concludes that the Compartment 05 Timber Project would provide an excellent opportunity for monitoring the effects of timber management activities on the Pink Lady's Slipper. The BE concluded that while the Pink Lady's Slipper, as well as suitable habitat for the Pink Lady's Slipper, were found, the relative abundance of the species throughout the Forests insures population viability.

### c. Northern Pine Snake (Sensitive)

The BE noted that the Northern Pine Snake occurs from New Jersey to Tennessee, Northern Georgia, and Alabama, and is thought to occur throughout these two National Forests. There was a recent report from Northwestern Georgia and a road-specimen from Northwestern South Carolina in the 1960s. The BE concluded

that Compartment 05 provides little suitable habitat for the snake. Although the area was not sampled for the snake, the BE concluded that there was a low likelihood of its presence. The BE acknowledged that if the snake is present, the habitat changes after timber harvest may reduce habitat suitability. The BE concluded that while it was possible that the project may affect individual members of the species, the project would not affect the population viability of the Northern Pine Snake.

### d. Rafinesque's Big–Eared Bat (Sensitive)

The BE noted that these bats typically roost and hibernate in caves and old buildings, none of which were on the site. However, these bats also had been found in hollow trees, which gave them potential to occur in the project area. The BE concluded that while an individual bat would be displaced if it were present in a tree that was burned or cut, the project would not significantly affect population viability.[3]

### e. Diana Fritillary (Sensitive)

The BE noted that the Diana Fritillary butterfly occurs throughout the Southern Appalachians, inhabiting pine and deciduous forests near streams. Violets serve as the host plant for larvae. Roads and further openings in moist woods may provide nectar plants for this butterfly. The BE noted reports of the butterfly in the site from 1965, 1967, and 1972. A Forest Service ecologist also reported seeing a female of the species in September 1993. Because suitable habitat for the Diana Fritillary species exists throughout the Forests, the BE concluded that population viability would not be affected.

---

**3.** The EA for Compartment 05 Timber Project, discussed *infra,* concluded that "nongame PETS species such as the Northern pine snake and rafinesque's big-eared bat may occur in the area." EA, p. 55.

### f. Peregrine Falcon (Anatom Subspecies) (Endangered)

The Peregrine Falcon (anatom subspecies) is an endangered species. The BE noted that there was potential habitat for the Peregrine Falcon in the Cedar Cliffs areas of the site and that there was a hack site for the falcon in North Carolina, approximately ten miles from Cedar Cliffs. However, there were no known Peregrine Falcons on Cedar Cliffs, and helicopter flights in the Cedar Cliffs area since 1987 have found no evidence of nesting. The BE concluded that while parts of the project area contain suitable habitat for the species, the timber project would have no adverse effects on the endangered Peregrine Falcon.

### g. Snowy Hydrangea (Sensitive)

The BE noted that the Snowy Hydrangea occurs in several areas within the Tallulah Ranger District. The BE noted that changes in the habitat after the project is completed may reduce the habitat suitability for the Snowy Hydrangea, but that the adverse effects on the Snowy Hydrangea will be local and will not decrease viability in the Forest.

### h. Witch Hobble (Sensitive)

The BE says the Witch Hobble occurs in wooded coves at elevations higher than the project site. The only record was "north of the summit on Hightower Bald." The BE then states, "[s]urprisingly, however, some individual plants were found in the project area." The BE reported that while the timber project may reduce habitat suitability for the Witch Hobble, these adverse effects "will be local and will not decrease viability on the forest, nor will they contribute to the listing of these species under the Endangered Species Act in the future."

### i. Green Salamander (Sensitive)

The BE reported that there was potential habitat for the Green Salamander in the Cedar Cliffs area. The BE reports that it is unknown whether any Green Salamander exist in the area because no surveys have been conducted to determine their presence. However, a letter was sent to the Forest Service by an individual named Ray Johns who essentially endorsed the sale but noted a concern about the habitat for the Green Salamander. (Tab 5) His letter noted that the Southern Highlands Plateau, in or near the timber sale areas, is a "core" area of the population of Green Salamanders. Johns explained that the Green Salamander already was on "the indicator list," and that it likely soon will be placed on "the endangered species" list. The BE concluded that while the project may reduce habitat suitability and adversely affect the Green Salamander, any adverse effects would be to individual members of the species and would not affect population viability.

### j. Southern Appalachian Cottontail Rabbit (Sensitive)

The BE noted habitat for the Southern Appalachian Cottontail Rabbit exists in the timber project site. It is unknown whether the rabbit also was found, apparently because no field surveys for the rabbit were done within Compartment 05. The BE concludes that while the timber project will reduce habitat suitability for the short term, it may have long term beneficial effects. The BE does not explain how or why the project could have long term beneficial effects on the viability of this rabbit or its habitat, but the Court assumes it is due to logging trees creating early successional growth. The BE acknowledges that individual rabbits may be affected by the timber project, but the project would not affect population viability in the Forest.

### k. Yellow Lady's Slipper (Sensitive)

While potential habitat for the Yellow Lady's Slipper was found, the plant itself was not found in the project area. While present throughout the Forest, the Yellow Lady's Slipper was listed as "unusual" due to the threat of private collection for gardens and for medicinal purposes. Because the Yellow Lady's Slipper was not found in

the project area, the BE concluded that it would suffer no adverse effects. *However, the BE concludes with this admission that "[i]t is unknown at this time whether the effects of timber cutting and fire are positive or negative to some of our PETS plant species."* BE, Ex. 33 (emphasis supplied).

### l. Raven (Sensitive)

The BE reports that the raven is being considered for "endangered status" in the Southeast because it is restricted to mountainous areas above 3,000 feet. The Raven has been found in two locations in Georgia. The BE noted that the Cedar Cliffs area on this timber project site provides potential habitat for the raven. The BE concluded that even though the Raven may have a transient presence in the project area, the project should not have direct effects on Ravens and will not affect the population viability of the Raven.

### m. Cerulean Warbler (Sensitive)

The BE reported that although the timber project area provides suitable habitat for the Cerulean Warbler, there have been no confirmed sightings in this Tallulah District in the last three years. Accordingly, the BE concludes that the project will have no direct effects on the Cerulean Warbler. However, it might have beneficial effects on the Cerulean Warbler habitat.

### n. Masked Shrew (Sensitive)

The BE noted habitat exists for the Masked Shrew in the project area, but that *no surveys to date have been done for the Masked Shrew in the Chattahoochee National Forest.* There were small mammal surveys being conducted at the time the BE was issued in other areas of the Chattahoochee National Forest, but they apparently were not yet completed. The BE found that the project may reduce habitat suitability in the short term, but may increase soon thereafter. While individual Masked Shrews may be adversely affected, the project will not affect population

tion viability of the Masked Shrew in the Forest.

### o. Pygmy Shrew (Sensitive)

The BE noted that recent (1985) surveys located the Pygmy Shrew in the Chattahoochee National Forest. The BE also reported potential habitats for the Pygmy Shrew in the specific project area. However, the BE indicated that no surveys were conducted to determine if the Pygmy Shrew is in this timber project site. Even assuming the project affects individual existing Pygmy Shrews in the project area and destroys potential habitat for other Pygmy Shrews, the BE drew the same conclusions about the Pygmy Shrew as about the Masked Shrew, to wit: even if the timber project destroys individual Pygmy Shrews and habitat for Pygmy Shrews, the timber project will not affect population viability of the Pygmy Shrew.

### 2. *BE's Summary of Impact on Endangered and Sensitive Species*

The BE ends with this summary of the impact of the proposed timber sale:

*Threatened and Endangered species*

Implementation of the proposed action will have **NO EFFECT** on the Small Whorled Pogonia or the Peregrine Falcon. There were no documented findings or observations of any federally listed species in the project area.

*Sensitive species*

Implementation of the preferred action **MAY IMPACT** local populations of pink ladyslippers, snowy hydrangea and witch hobble, but will not likely result in a trend to federal listing or loss of viability on the Forest. It is probable that a[sic] some timber management could actually have some direct beneficial effects on some plants. Furthermore, if present, the preferred alternative **MAY IMPACT** individual Northern Pine Snake, Rafinesque's Big–Eared bat, Diana Fritillary, Green Salamander, Southern Appalachian cottontail, Masked shrew and Pygmy shrew, but

will be local and will not likely result in a trend to federal listing or loss of viability on the Forest. Other known sensitive wildlife or plants will have **NO IMPACT** in the project area. No documentation records, findings or observations of other species were found in the project area.

### 3. *Environmental Assessment*

After the BE is completed, an EA for the Compartment 05 Timber Project was prepared and released in May, 1994.

#### a. Management Indicator Species

The EA employs the MIS concept. Under the MIS concept, the Forest Service selects a few species that the Forest Service determines represent a large group of other species with similar habitat requirements. A particular species is chosen as an MIS species because population changes in these species are thought to represent the effects of management activities on the larger group of represented species. The MIS chosen for the Compartment 05 Timber Project were: (1) the Yellow Lady's Slipper, (2) the Pileated Woodpecker, (3) the Black Bear, (4) the Gray Squirrel, (5) the Brown and Rainbow Trout, (6) the Dusky Salamander, (7) the Deer, (8) the Turkey, and (9) the Yellow Fin Shiner. EA, pp. 3–4.

The EA summary of the effects on MIS species indicates that the only alternative having a detrimental effect on any of the MIS species, specifically the Black Bear, the Deer, and the Turkey, is the no-action alternative. All other alternatives, including the chosen alternative 3 for this timber project, either maintain most of the MIS species or enhance the population of the Black Bear, the Deer, and the Turkey.

The EA itself does not reveal how the Forest Service determined that the project would not affect the MIS species. The EA does not indicate whether the selected MIS species inhabit the project area. The EA does not include or refer to any current inventory or population data or population data trends on the selected MIS species. While the EA references some articles, the articles are not in the EA record, the administrative record about the timber project, the Forest Plan record, or even apparently anywhere in the process record.

#### b. Effects on Biological Diversity

The EA also examines the effects of the project on biological diversity ("biodiversity"), which includes the variety of genes, species, communities, ecosystems, and processes by which organisms interact with one another. Diversity exists on four levels: (a) species diversity; (b) community diversity; (c) successional diversity; (d) old-growth, as well as interaction among the elements.

Species diversity refers to the diversity of species in the forest, as well as specific sites in the forest. Community diversity refers to variety in the 44 different communities, i.e., hardwoods, upland oak, shortleaf pine, which exist in the forest. Species diversity is listed as the type of diversity that most often is affected by management activities.

Successional diversity refers to the variety of animals that inhabit a habitat over various successional periods. Old-growth, in and of itself, creates diversity when spread between blocks of land featuring early successional vegetation. Interaction among elements refers to patterns of occurrence. Patterns may either promote interaction among genes, species, communities, and ecosystems or decrease it. The EA noted that 2000 plant species and 500 animal species were known to exist in the forest; and while the habitat needs for all of these species were not known, EA concluded that the wide range of vegetative communities would continue to support the species in the forest.

According to the EA, the timber project will not decrease biodiversity, but, if anything, will increase biodiversity.

### 4. *EA's Summary of Impact on PETS Species*

The EA discusses the effects of the timber project on the "PETS" species, which includes the sensitive and endangered species in the project site. The EA states that the no-action alternative would have no effects on PETS or their current or potential habitats. The EA concludes that the timber project will destroy individual sensitive species locally in the project site and will destroy suitable habitat for these species, but that the project will not result in a trend to federal listing or a loss of viability of the sensitive or endangered species in the Forests:

> *All Actions Alternatives* —No federally listed plants or animals species were found in the project area. Botanical and animal surveys will be conducted on all high risk sites prior to all future activities and impacts on federally listed species. All action alternatives may impact individual or local populations of pink ladyslippers, snowy hydrangea and witch hobble. These affects would not likely result in a trend toward federal listing or loss of viability on the Forest. It is probable that some types of timber management could have some beneficial affects on some plant species requiring more sunlight. Furthermore, if present, an action alternative may impact individual Northern Pine snake, Rafinesques's [sic] Big–Eared Bat, Diana Fritillary, Green Salamander, Southern Appalachian cottontail, Masked Shrew and Pygmy shrew. These affects would be local and would not result in a trend to federal listing or a loss of viability on the Forest. The project area contains no habitat specifically required by any one of these species. (See Biological Evaluation, Project File).
>
> *Cumulative Effects* —Refer to the Biological Evaluation, Project File.

Environmental Assessment, pp. 63–64.

### 5. *Decision Notice and Finding of No Significant Impact*

On August 8, 1994, the District Ranger issued the Decision Notice and Finding of No Significant Impact ("FONSI"), and adopting alternative three as the method of timber harvesting. The FONSI relied on the earlier BE in reaching its conclusion that no PETS species would be adversely affected by the timber project. The FONSI relied on the EA's analysis of Management Indicator Species to support its conclusion that alternative 3 would increase biodiversity.

The District Ranger's decision was appealed on a number of grounds and affirmed. In August, 1995, the timber contracts for the Compartment 05 project were awarded.

### 6. *Amended Biological Evaluation*

In February 1996, the 1993 Biological Evaluation for the Compartment 05 Timber Project was amended. The amended BE noted that Rafinesque's Big–Eared Bats would be displaced only temporarily if they were roosted in a hollow tree affected by the timber project. This did not alter the original BE's conclusion that the Bat's viability would not be impacted. The Amended BE indicated that the Witch Hobble, which was said to exist in the project area in the original BE, was, in fact, not located in the project area. However, the BE noted that the Georgia Natural Heritage Program has only one record of the Witch Hobble's occurrence in the state and, thus, the Witch Hobble would need to be protected from any impacts in the future. Necessarily, any impact on the Witch Hobble would adversely affect the species. Regarding the Green Salamander, the Amended BE noted that the preferred habitat for the species was outside the project area. Finally, the Amended BE concluded that the Pygmy Shrew was so widespread that viability would not be threatened by the project.

### K. Big Net Timber Project

The Big Net Compartment of the Chattahoochee and Oconee National Forests is located approximately eight miles southeast of Hiawassee, Georgia between Corbin Creek Road and Highway 17/75. The

Big Net Timber Project involves logging 115 acres in the Hiawassee River Basin and approximately 0.9 miles of temporary road construction. It proposes to discharge 12.7 tons of sediment into Big Net Branch, Briar Creek, Corbin Creek, High Shoals Creek, Rogers Branch, and the Upper Hiawassee River. Over five tons of that discharge are from the roads.

On April 14, 1993, the Defendant Forest Service released notice of its proposal to harvest timber in the Big Net Compartment of the Brasstown Ranger District.

## 1. *Biological Evaluation*

On August 30, 1993, the Defendant Forest Service released its BE for the Big Net Timber Project. The BE identified the impacted sensitive or endangered species for Big Net as: (1) the Small Whorled Pogonia; (2) the Yellow Lady's Slipper; (3) the Pink Lady's Slipper; (4) the Manhart's Sedge; (5) the Northern Pine Snake; (6) the Rafinesque's Big–Eared Bat; (7) the Diana Fritillary; and (8) the Brook Trout.

### a. Small Whorled Pogonia (Endangered)

The BE describes the Small Whorled Pogonia orchid as a Federally Endangered Species. The BE states the Small Whorled Pogonia has been found in nine locations in the Chattahoochee National Forest, including the Brasstown Ranger District that includes the Big Net Timber Project. The findings regarding the Small Whorled Pogonia parallel the BE for the Compartment 05 Timber Project.

### b. Yellow Lady's Slipper (Sensitive)

The Yellow Lady's Slipper was found on the timber project site. The BE concludes that while the project will affect individual Yellow Lady's Slippers (and habitat too), the project is not likely to result in a trend to federal listing as endangered or a loss of viability.

### c. Pink Lady's Slipper (Sensitive)

The Pink Lady's Slipper was observed on the timber project site. The BE's findings regarding the Pink Lady's Slipper parallel the findings in the BE for the Compartment 05 Timber Project.

### d. Manhart's Sedge (Sensitive)

The BE reports that the Manhart's Sedge is endemic to the Southern Appalachians and occurs on rich, steep slopes and stream banks at mid-elevations. The BE notes that the Manhart's Sedge is classified as a "State Threatened Species in Georgia." It previously had been reported to exist in surrounding areas. The Manhart's Sedge was located in the project area. The BE indicates that the "MS is thought to be relatively common on the Forest but known locations are limited." The BE further indicates "[a]lthough individuals of this species will be impacted by the proposed action, protection of significant populations in these and other projects will maintain species viability in the Forest." Although the timber project will destroy individual Manhart's Sedges in the project area and suitable habitat for other Manhart's Sedges, the BE concluded that the project would not affect viability of the Manhart's Sedge.

### e. American False Hellebore (Sensitive)

The BE reported that fifty individual American False Hellebore were seen in the timber project area. The BE states "mitigation measures will be implemented to protect the population of American False Hellebore and the significant populations of Manhart's Sedge. This will include the exclusion of logging, logging equipment, tree felling and road construction in the colony sites."

### f. Rafinesque's Big–Eared Bat (Sensitive)

The findings regarding the Rafinesque's Big–Eared Bat parallel those in the BE for the Compartment 05 Timber Project.

### g. Diana Fritillary (Sensitive)

The BE reports the Diana Fritillary butterfly "could potentially occur on the project area." The findings regarding the Diana Fritillary parallel those in the BE for the Compartment 05 Timber Project.

### h. Brook Trout (Sensitive)

According to the BE, the Brook Trout is the only trout species native to Georgia. Brook Trout are already present in High Shoals Branch, which flows through the project area, and could be present in the lower section of Grapevine Cove and Rogers Branches, which are tributaries of High Shoals. The Brook Trout could be present in other tributaries in the project area. The Forest Service apparently acknowledges that sedimentation from the logging and road construction may enter trout streams causing warming of trout streams and further decline of Brook Trout. The BE concluded that viability of the Brook Trout would not be adversely affected as long as "Forest Land Management Standards and Guidelines" and State "Best Management Practices" were followed. In particular, the BE advises that mitigation measures are needed to prevent sedimentation entering and warming trout streams. These measures are identified elsewhere as primarily "silt fencing" during logging and road construction activities.

### 2. *BE's Summary of Impact on Endangered and Sensitive Species*

VI. *CUMULATIVE EFFECTS*

Habitat changes resulting from the proposed actions and from activities in the vicinity of the project may, over time, affect the plant species composition in the area. The addition of light into the areas will provide the opportunity [LINES ARE MISSING FROM THE TOP OF PAGE OF RECORD] No federally listed plant species were found in the project area. Botanical surveys will be conducted on all high risk sites prior to all future activities and impacts on federally listed species will be avoided. Significant populations of

sensitive plant species will be protected to maintain viability on the Forest. Therefore, cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect PETS plant species.

As long as Forest Land Management Plan Standards and Guidelines and State BMP's are followed to prevent sedimentation and warming of the trout streams, there should be no adverse cumulative effects to brook trout by this or future activities. The continuation of projects such as stream structures for improving trout habitat should have the cumulative effect of perpetuating and possibly increasing populations.

Habitat for Northern pine snake, Rafinesque's big-eared bat and Diana fritillary butterfly are found throughout the Chattahoochee National Forest. The project site contains no habitat specifically required by any of these species. Cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect these PETS animals.

VII. *DETERMINATION OF EFFECT*

The proposed action *will not affect* small whorled pogonia. The project *will not impact* brook trout or American false hellebore. The project *may impact* individuals of pink lady's slipper, yellow lady's slipper, Manhart's sedge, and if present, Northern pine snake, Rafinesque's big-eared bat and Diana fritillary, but is not likely to result in a trend to federal listing of any of these species under the Endangered Species Act, or a loss of viability on the Forest.

### 3. *Environmental Assessment*

The EA for the Big Net Timber Project was released in March, 1995. The EA addressed the concern about the Forest Service's lack of inventory or population data for sensitive and endangered animals and species in the project area and forest-wide, by responding that the law does not re-

quire the collection of current inventory data for purposes of timber projects on specific sites.

### a. Management Indicator Series

The EA for the Big Net Timber Project, as did all other EAs for the other timber projects, relied on the MIS to examine the effects of the timber project on biological diversity.

The MIS species chosen for the Big Net Timber Project were: (1) the Yellow Lady's Slipper, (2) the Pileated Woodpecker, (3) the Black Bear, (4) the Gray Squirrel, (5) the Brown and Rainbow Trout, (6) the Dusky Salamander, (7) the Deer, (8) the Turkey, (9) the Grouse, and (10) the Indigo Bunting. The EA concludes that each of the timber harvesting alternatives will maintain the existing level of biological diversity. The EA does not appear to address the viability of the MIS species, but to use the MIS species to evaluate the effect of the timber project on diversity. The EA cites no past or current population numbers for the MIS species and does not appear to analyze viability or population trends for the MIS species, either forest-wide, or by ranger district, compartment, or timber project.

### 4. *EA's Summary of Impact on PETS Species*

The EAs for these timber projects appear to rely on the BEs for their evaluation of effect on PETS. The EA[4] simply echoes the results of the BE regarding the impact of the Big Net Timber Project on the sensitive species and their habitats in the project area. The EA concludes as follows:

> Botanical surveys will be conducted in high risk areas for this and all future activities and impacts on federally listed plant species will be avoided. Future actions may impact some individuals of Sensitive plants. However, all significant populations of these species will be protected so as to maintain their viability on the Forest. Therefore, the cumulative effects from past, present, and reasonably foreseeable future actions will not have significant effects on PETS plant species.
> Habitat for Rafinesque's big-eared bat, northern pine snake, and the Diana Fritillary butterfly are found throughout the Chattahoochee National Forest. The project site contains no habitat specifically required by any of these species. Any future projects in the area will also be evaluated for potential PETS species, and impacts will be mitigated or avoided as needed. Therefore, cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect these PETS animals.

Environmental Assessment, pp. 68–69.

The EA notes that all of the Big Net Project is in two "Georgia Mountain Treasures' Wildland" proposals by the Wilderness Society. These proposals seek to remove these lands from projects that contain timber sales and road construction until the new Forest Plan is revised. The Forest Plan usually is revised every 10 years. Because the latest Forest Plan for the Chattahoochee and Oconee National Forests is a 1985 Plan, this revision process is now underway.

The EA itself does not reveal how the Forest Service determined that this project would not affect the MIS species. The EA does not include any current inventory or population data or population data trends on the selected MIS species or the PETS species. Instead, the EA simply refers to the names of persons and literature consulted. The literature list contains over thirty articles (EA, pp. 100–103), but the vast majority of the articles concern other issues, such as water quantity and quality control, soil and air issues, impact of noise on recreationists, fire man-

---

4. A corrected EA was issued at a later date. The corrections contained in the corrected EA

affect none of the issues in this lawsuit.

agement, sediment production, etc. None of these articles appears to have any inventory data or population data or population trend analysis or any studies of any sort about the viability of sensitive species of plants and animals in either the Chattahoochee or Oconee National Forests. In any event, none of these articles appears to be in the administrative record or the project record or the process record.

### 5. Decision Notice and Finding of No Significant Impact

On April 28, 1995, the District Ranger issued the Decision Notice and Finding of No Significant Impact and selected alternative five as the method of timber harvest. The no-action alternative was rejected because it did not provide for healthy and vigorous timber species, did not produce renewable resource outputs, and would not improve conditions for saw timber production. The FONSI indicates alternative five is selected because, among other reasons, "threatened or endangered species are protected through mitigating measures." FONSI, p. 7.

The District Ranger's decision was appealed on several grounds and affirmed. On October 2, 1995, the timber contract for the Big Net Timber Project was awarded to Bert Thomas.

### L. Tibbs Trail Timber Project

The Tibbs Trail Compartment of the Chattahoochee and Oconee National Forests is a 6,672 acre compartment located eight miles northeast of Chatsworth, Georgia. The Tibbs Trail Timber Project includes logging on 439 acres, including 173 acres of clearcutting, plus 6.4 miles of roads. It proposes to discharge 93.1 tons of sediment, over existing amounts, into Bear Branch, Dill Creek, Emery Creek, Milma Creek, and Holly Creek. Approximately 41 tons of that amount are from the roads.

On July 8, 1993, District Ranger Black issued notice of a proposal to harvest timber in the Tibbs Trail Compartment of the Cohutta Ranger District.

### 1. Biological Evaluation

The administrative record before the Court contains an EA issued in March, 1995, an amended BE issued in June, 1995, and a corrected EA issued in August, 1995. Apparently, there was an earlier BE in 1992 before the first EA, but it is not in the current record before the Court. Thus, the Court discusses only the amended BE in 1995. The two original timber sales (Upper and Lower Tibbs) were combined into one sale. Both initial BEs were signed January 9, 1992 and August 19, 1992, and the Amendment was signed on March 30, 1994.

On June 22, 1995, the Defendant Forest Service released an amended BE for the Tibbs Trail Timber Project. The amended BE identifies the impacted sensitive or endangered species for Tibbs Trail as: (1) Upland Combshell; (2) the Southern Acronshell; (3) the Fine–Lined Pocketbook; (4) the Alabama Moccasin shell; (5) the Coosa Moccasin shell; (6) the Southern Club shell; (7) the Southern Pigtoe; (8) the Ovate Club shell; (9) the Triangular Kidney shell; (10) the Tennessee Heelsplitter; (11) the Blue Shiner; (12) the Holiday Darter; (13) the Trispot Darter; (14) the Cerulean Warbler; (15) the Diana Fritillary; (16) the Rafinesque's Big–Eared Bat; (17) the Small Whorled Pogonia; (18) the Yellow Lady's Slipper; (19) the Large Whorled Pogonia; (20) the American Ginseng; (21) the Southeastern Shrew; (22) the Northern Pine Snake; (23) the Masked Shrew; and (24) the Pgymy Shrew.

### a. Upland Combshell, Southern Acronshell, Fine–Lined Pocketbook, Alabama Moccasin shell, Coosa Moccasin shell, Southern Club shell, Southern Pigtoe, Triangular Kidneyshell, and Tennessee Heelsplitter (Endangered)

These species of mussels inhabit high quality streams and rivers. The BE notes that "ten Coosa basin freshwater mussels are listed as endangered and that one is a

candidate for listing." The BE indicates that high gradient streams like those existing in the project area were not conducive to mussels. While no mussels were found in the timber project site, these species do occur in the main channel of the Conasauga River in the project area. Also, these species of mussels were located downstream from the project area. The BE concludes that the timber project would not have any impact on these species.

### b. Blue Shiner (Endangered)

The Blue Shiner is a federally endangered species. The BE reports that while the Blue Shiner occurs in Holly Creek (about six miles from the project area), it was not found in the project site. The BE concludes that the species would not be impacted by the timber project.

### c. Holiday Darter (Threatened)

The BE reports that the Holiday Darter also occurs in Holly Creek, but that it was not observed on the project area. The Holiday Darter prefers habitats of bedrock and gravel pool areas in small creeks to moderate-sized rivers. The BE concludes that the Holiday Darter would not be impacted by the timber project.

### d. Trispot Darter (Sensitive)

The BE notes that the Trispot Darter does not prefer mountainous regions of lower temperatures and higher gradients, which exist in the project area. While the Trispot Darter is known to exist in Holly Creek in the same areas as the Blue Shiner, none was discovered on the project area. The BE concludes that the project would have no impact on this species.

### e. Cerulean Warbler (Sensitive)

The findings regarding the Cerulean Warbler parallel those in the BE for the Compartment 05 and Big Net Timber Projects. The BE reports that the Cerulean Warbler is known to occur in the project area or in higher elevations at Lake Conasauga and the Cohutta Wilderness.

### f. Masked Shrew (Sensitive)

The habitat for the Masked Shrew occurs in the project area but in timber stands that are not proposed for harvest.

### g. Pygmy Shrew (Sensitive)

The BE reports the Pygmy Shrew is found in a wide range of habitats. The Pygmy Shrew was found just north of the timber project area and could occur in the project area.

### h. Fort Mountain Sedge (Sensitive)

The Fort Mountain Sedge is a candidate for endangered species, but the BE reports it will eventually come off the list. The Fort Mountain Sedge occurs on rich, steep, mid-elevation slopes, and has been documented in eight counties in Georgia, including Murray County. Although the habitat is suitable, the Fort Mountain Sedge was not discovered in a survey of the project area. The BE concludes that the project would not impact the Fort Mountain Sedge.

### i. Diana Fritillary (Sensitive)

The Diana Fritillary butterfly occurs through the Southern Appalachians. The BE reports that the Diana Fritillary could potentially occur in the project area.

### j. Rafinesque's Big–Eared Bat (Sensitive)

The BE reports that the timber project site does provide the preferred habitat for the Rafinesque's Big–Eared Bat and could affect individual bats. However, the BE concludes that the project will not affect population viability.

### k. Small Whorled Pogonia (Endangered)

The findings regarding the endangered Small Whorled Pogonia parallel those in the BEs for the Compartment 05 and Big Net Timber Projects.

**l. Yellow Lady's Slipper (Sensitive)**

The findings regarding the Yellow Lady's Slipper parallel those in the BEs for the Compartment 05 and Big Net Timber Projects.

**m. Pink Lady's Slipper (Sensitive)**

The findings regarding the Pink Lady's Slipper parallel those in the BEs for the Compartment 05 and Big Net Timber Projects.

**n. Large Whorled Pogonia (Sensitive)**

The BE reported that one site of Large Whorled Pogonia and two sites of Pink Lady's Slipper were found in the area. However, due to their small numbers on the site, the BE reports they will not be protected during the harvesting. The BE did not indicate whether the Large Whorled Pogonia was populous enough in other parts of the forest to insure population viability.

**o. American Ginseng (Sensitive)**

The BE notes that the American Ginseng is known to occur throughout the North Georgia Mountains in rich moist coves. However, because it was not located in the project area, the BE concludes that the American Ginseng would not be affected by the proposed action.

**p. Southeastern Shrew (Sensitive)**

The BE notes a potential habitat for the Southeastern Shrew in the project area, but that the area was not sampled for the Southeastern Shrew. The BE concludes that while the project may impact members of this species, overall viability in the forest would not be placed at risk.

**q. Northern Pine Snake (Sensitive)**

The findings with respect to the Northern Pine Snake parallel the findings in the BEs for the Compartment 05 and Big Net Timber Projects. The area was not sampled for the Northern Pine Snake because there is a low likelihood it would occur.

**2. *BE's Summary of Impact on Sensitive and Endangered Species***

*POTENTIAL EFFECTS ON SPECIES AND HABITATS*

No federally listed species were found during field surveys of the project area and down stream for aquatic species. The only federally listed species that had potential to occur in the area is the blue shiner. However, it was not found during the surveys. The blue shiner is not known to occur this far up stream on Holy Creek. The closest population is approximately 6 miles down stream. The listed species of mussels are located down stream of the project area either below the Holly Creek and Rock Creek junction or in the main channel of the **[RECORD IS MISSING REST OF PARAGRAPH]**

*CUMULATIVE EFFECT*

Habitat changes resulting from the proposed actions and from activities in the vicinity of the project, may over time, affect the plant species composition in the area. Botanical surveys will be conducted in high risk areas prior to all future activities in the area, and impacts to federally listed species will be avoided. Significant populations of Forest sensitive plant species will be protected to maintain viability on the Forest, and to prevent future listing under the Endangered Species Act.

Impacts of future projects to the Cerulean warbler, masked shrew and the Pygmy shrew, if present, is likely to impact individuals only, in some cases merely by temporarily displacing them. This is not likely to threaten their viability on the Forest. At the time of these future projects, they will be analyzed utilizing any new information available on these species or others possibly impacted. Negative effects to Federally listed species will be avoided. Forest Sensitive animals will receive mitigating measures if necessary, to ensure viability of the species on the Forest, and to prevent

future listing under the Endangered Species Act.

As long as Forest Land Management Plan Standards and Guidelines are followed to prevent sedimentation of the streams, there should be no adverse cumulative effects to the mollusks, blue shinner [sic], holiday darter and the trispot darter. . . .

. . . .

Habitat for Rafinesque's big-eared bat, the Diana Fritillary butterfly are found throughout the Chattahoochee National Forest. The project site contains no habitat specifically required by these species. Cumulative effect from past, present, and reasonably foreseeable future actions will not adversely affect these PETS species.

*DETERMINATION OF EFFECT*

The proposed action *may impact individuals* of Rafinesque's bit-eared [sic] bat, and Diana fritillary if present, *but is not likely to result in a trend to federal listing of these species under the Endangered Species Act, or a loss of viability* on the Forest.

### 3. *Environmental Assessment*

The MIS species selected in the EA for the Tibbs Trail Timber Project were the same as those selected for the Big Net Timber Project. The MIS species selected were: (1) Yellow Lady's Slipper; (2) the Pileated Woodpecker; (3) the Black Bear; (4) the Gray Squirrel; (5) the Rainbow and Brown Trout; (6) the Dusky Salamander; (7) the White Tailed Deer; (8) the Ruffled Grouse; (9) the Wild Turkey; and (10) the Indigo Bunting.

After reviewing the effects of the timber project on the MIS species, the EA determines that none of the proposed alternatives would significantly impact wildlife habitat. Specifically, the EA reports that the timber project would cause slight decreases in the populations of Pileated Woodpecker, Black Bear, and Gray Squirrel in alternatives two, three, four, and five, while maintaining the population of all of the other MIS species. The EA reports

alternative one (no-action alternative) as showing a slight decrease in the population of Ruffed Grouse and a decrease in the population of the Indigo Bunting. All other species' populations were maintained. The EA notes that the species reductions in all alternatives were due to displacement of individual species and their required habitats and were likely short-term.

The EA summarizes the cumulative effects on the sensitive species in the project in the same manner as the amended BE did. EA, pp. 94–95.

The EA also contains the same sentence seen in all other EAs, to wit: "Because of this current policy, cumulative effects from past, present, or reasonably foreseeable future actions are not expected to significantly affect PETS populations." EA, p. 95.

The EA finds, among other things, that biodiversity would increase in each of the action alternatives and decrease in the no-action alternative. The basis for this finding was that in the no-action alternative, species relying on early successional habitat would decline as the early successional habitat dissipated over time. In each of the action alternatives, however, while the numbers of early successional species would not increase, the numbers of the members of these species already present on the project site would increase.

### 4. *Corrected Environmental Assessment*

On August 3, 1995, the Defendant Forest Service released a corrected EA addressing information in the amended BE. The EA assessed impacts of the proposed alternatives on PETS species based on information contained in the amended BE. The Corrected EA reports that alternative one (no-action alternative) would have no impact on any PETS species, absent habitat changes resulting from natural occurrences. The EA reports that alternatives two, three, four, or five would have an insignificant impact on the ten mussel species, the Blue Shiner, and the two species

of Darters, as long as mitigation measures were followed. The EA reports no impact on the Cerulean Warbler, and that while individual members of the other species discussed in the BE could be impacted, their viability was not threatened.

### 5. *Decision Notice and Finding of No Significant Impact*

On August 3, 1995, the District Ranger issued his Decision Notice and Finding of No Significant Impact. The District Ranger selected alternative three as the method of harvest and found that it represented no significant adverse effects to the environment. The decision was affirmed on appeal. The timber contract for this project has not been awarded.

### M. Upper Swallows Timber Project

The Upper Swallows Compartment of the Chattahoochee and Oconee National Forests is approximately five miles southeast of Hiawassee, Georgia. The timber project area is located between Highway 76 and Highway 17/75. The project involves logging 83 acres in the Hiawassee River Basin and construction of approximately 1.4 miles of temporary roads. It proposes to discharge 12.9 tons of sediment, over existing amounts, into Cove Branch, Kendall Branch, Shoal Branch, and Swallows Creek. Approximately 8.2 tons of that discharge will result from the road. On January 21, 1993, the Defendant Forest Service notified the public of its intent to harvest timber in the Upper Swallows Timber Project in the Brasstown Ranger District.

### 1. *Biological Evaluation*

On August 27, 1993, the Defendant Forest Service completed the BE for the Upper Swallows Timber Project. The BE identifies the impacted sensitive or endangered species in the Upper Swallows Timber Project as: (1) Small Whorled Pogonia; (2) the Yellow Lady's Slipper; (3) the Pink Lady's Slipper; (4) the Manhart's Sedge; (5) the Small Purple Fringed Orchid; (6) the Northern Pine Snake; (7) the

Rafinesque's Big–Eared Bat; and (8) the Diana Fritillary.

### a. Small Whorled Pogonia (Endangered)

The findings about the Small Whorled Pogonia Orchid parallel the findings in the BEs for the Compartment 05, Big Net Timber, and Tibbs Trail Timber Projects. Although the Small Whorled Pogonia was not found on this specific timber project site, it has been found in the Brasstown Ranger District in the past.

### b. Yellow Lady's Slipper (Sensitive)

The findings about the Yellow Lady's Slipper parallel those in the BE for the Compartment 05, Big Net Timber, and Tibbs Trail Timber Projects. The Yellow Lady's Slipper was found in the project site.

### c. Pink Lady's Slipper (Sensitive)

The findings regarding the Pink Lady's Slipper parallel those in the BE for the Compartment 05, Big Net Timber, and Tibbs Trail Timber Projects. Although the Pink Lady's Slipper was not found on one part of the project site, the BE states it "could potentially be present in stand 25, Compartment 315 in this project."

### d. Manhart's Sedge (Sensitive)

The findings regarding the Manhart's Sedge parallel those in the BE for the Big Net Timber Project. The Manhart's Sedge has been found in this timber project area, specifically "scattered populations in stand 13, Compartment 315, and stands 7 and 26, Compartment 317 in the Upper Swallows Creek Project."

### e. Small Purple Fringed Orchid (Sensitive)

The BE reports that the Small Purple Fringed Orchid occurs in the moist north-facing coves and in alluvial woods and is known from several locations on this Brasstown Ranger District. A single

member of this species was observed in one of the stands during the field surveys. The BE notes that mitigation measures would protect this species from any significant adverse impact due to the timber project.

#### f. Northern Pine Snake (Sensitive)

The findings regarding the Northern Pine Snake parallel the findings in the BE for the Compartment 05, Big Net Timber, and Tibbs Trail Timber Projects. However, the BE adds for this project that "the drier Virginia pine stand in the project area appears to be potential habitat for this species."

#### g. Rafinesque's Big–Eared Bat (Sensitive)

The findings regarding the Rafinesque's Big–Eared Bat parallel the findings in the BE for the Compartment 05, Big Net Timber, and Tibbs Trail Timber Projects.

#### h. Diana Fritillary (Sensitive)

The findings about the Diana Fritillary parallel the findings in the BE for the Compartment 05, Big Net Timber, and Tibbs Trail Timber Projects.

#### 2. *BE's Summary of Impact on Endangered and Sensitive Species*

*CUMULATIVE EFFECTS*

Habitat changes resulting from the proposed actions and from activities in the vicinity of the project may, over time, affect the plant species composition in the area. The addition of light into the areas will provide the opportunity for establishment of more light-dependent species, but precluding establishment of species requiring low levels of light.

No federally listed *[illegible word]* species were found in the project area. Botanical surveys will be conducted on all high risk sites prior to all future activities and impacts on federally listed species will be avoided. Significant populations of sensitive plant species will be protected to maintain viability on the Forest. Therefore, cumulative effects from past, present, and reasonably fore-

seeable future actions will not adversely affect PETS plant species.

Habitat for Northern pine snake, Rafinesque's big-eared bat and Diana fritillary butterfly are found throughout the Chattahoochee National Forest. The project site contains no habitat specifically required by any of these species. Cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect these PETS animals.

#### VII. *DETERMINATION OF EFFECT*

The proposed action *will not affect* small whorled pogonia. The project *will not impact* small purple fringed orchid. The project *may impact* individuals of yellow lady's slipper, Manhart's sedge, and if present, pink lady's slipper, Northern pine snake, Rafinesque's big-eared bat and Diana fritillary, but is not likely to result in a trend to federal listing of any of these species under the Endangered Species Act, or a loss of viability on the Forest.

#### 3. *Environmental Assessment*

On March 8, 1996, the Defendant Forest Service released the EA for the Upper Swallows Timber Project. The EA discusses five alternative courses of conduct, including a no-action alternative, in terms of biodiversity, wildlife habitat, and effects on PETS species.

#### a. Management Indicator Species

The EA chose the following MIS species for the Upper Swallow Timber Project: (1) the Pileated Woodpecker, (2) the Black Bear, (3) the Gray Squirrel, (4) the Brown and Rainbow Trout, (5) the Dusky Salamander, (6) the Deer, (7) the Grouse, (8) the Turkey, and (9) the Indigo Bunting.

The EA estimates that the no-action alternative benefits late successional species like the Pileated Woodpecker and the Gray Squirrel, but does not benefit early successional species like the Grouse and Indigo

Bunting. Over time, the no-action alternative would not benefit the Deer, Bear, Grouse, and Turkey because food sources for these species would decline with the dissipation of the early successional habitat. The various timber harvesting alternatives may increase the levels of early successional habitat species but will not increase the levels of other species like the Deer, Grouse, Turkey, or Bear because food sources already are adequate enough to support these species. This timber project, like all of the others, will cause some habitat fragmentation that affects some neo-tropical migrant birds and other species that require continuous forest canopy.

### 4. *EA's Summary of Impact on PETS Species*

Based on the prior BE, the EA reports that none of the alternatives will have a significant adverse effect on any PETS species. The EA also notes that Plaintiff Sierra Club had inquired whether the Forest Service "uses current and updated inventories on plant and animal communities in the forest, each compartment and each stand to write its EA." The EA notes that its response to Sierra Club was "[t]his question has been decided by law. The Forest Service is not required to do this analysis on an individual project." EA, p. 15. The EA does acknowledge that the effect of the project on endangered and sensitive species is a significant issue, but concludes that the project would have no impact because the Forest Service will use mitigation measures. For example, the EA states that "areas to be cut over or having road construction will be surveyed for threatened and endangered plants. If found, mitigating measures will be used for protection." EA, p.13.

### 5. *Decision Notice and Finding of No Significant Impact*

On May 11, 1995, the District Ranger issued the Decision Notice and Finding of No Significant Impact. The District Ranger selected alternative five as the method of harvest and found that alternative five would have no significant adverse environmental effects. The District Ranger's decision was affirmed. On January 16, 1996, the timber contract for the Upper Swallows Timber Project was awarded to Bert Thomas.

### N. South Corn Ridge Timber Project

The South Corn Ridge Compartment of the Chattahoochee and Oconee National Forests is a 3,500 acre area located approximately six miles southeast of Hiawassee, Georgia near the Sovallos and Dismal Creeks and seven miles south of Hiawasee off Corbin Creek Road. The South Corn Ridge Timber Project involves logging 178 acres in the Brasstown Ranger District. The project area is located between Dick's Creek Gap and Tray Gay and includes 1.6 miles of road. It proposes to discharge 18.5 tons of sediment, over existing amounts, into Dismal Creek, Mill Creek, Swallows Creek, and Wike Creek. Approximately 10.9 tons of that discharge will result from the roads.

On October 1, 1993, the Defendant Forest Service released notice of its proposed timber project in the South Corn Ridge Compartment of the Brasstown Ranger District.

### 1. *Biological Evaluation*

On July 27, 1995, the Defendant Forest Service released the BE for the South Corn Ridge Timber Project. The BE identifies these impacted endangered and sensitive species in the South Corn Ridge Timber Project: (1) the Small Whorled Pogonia, (2) the Pink Lady's Slipper, (3) the Yellow Lady's Slipper, (4) the Manhart's Sedge, (5) the Golden Seal, (6) the Mountain Maple, (7) the Rosy Twisted Stalk, (8) the American False Hellebore, (9) the Pygmy Shrew, (10) the Masked Shrew, (11) the Diana Fritillary, and (12) the Brook Trout.

### a. Small Whorled Pogonia (Endangered)

The Small Whorled Pogonia has been found in the past in this same Brasstown

Ranger District, but was not found on the project site. The findings regarding the Small Whorled Pogonia parallel those in the BE for the Compartment 05, Big Net, Tibbs Trail, and Upper Swallows Timber Projects.

### b. Pink Lady's Slipper *(Sensitive)*

The Pink Lady's Slipper was found in several stands of this timber project area. The findings regarding the Pink Lady's Slipper parallel those in the BE for the Compartment 05, Big Net, Tibbs Trail, and Upper Swallows Timber Projects.

### c. Yellow Lady's Slipper (Sensitive)

The Yellow Lady's Slipper was found on several stands in this timber project area. The findings regarding the Yellow Lady's Slipper parallel those in the BE for the Compartment 05, Big Net, Tibbs Trail, and Upper Swallows Timber Projects.

### d. Manhart's Sedge (Sensitive)

Several large populations of Manhart's Sedge, as well as scattered individuals of the Manhart's Sedge, were found on the project site. The findings regarding the Manhart's Sedge parallel those in the BE for the Big Net and Upper Swallows Timber Projects.

### e. Golden Seal (Sensitive)

The Golden Seal occurs in rich moist coves. Although there is a record of the Golden Seal occurring in or near the project area, none was discovered in the project area. Thus, the BE concludes that the Golden Seal will not be impacted by the project.

### f. Mountain Maple (Sensitive)

The Mountain Maple is found at high elevations, especially on boulder fields and rich coves. The BE reports that the Mountain Maple was not found in the project area. Thus, the BE concludes that the Mountain Maple species will not be affected by the project.

### g. Rosy Twisted Stalk (Sensitive)

The Rosy Twisted Stalk is known from only one high elevation boulder field in the vicinity of the project area, but was not found in the project area. Thus, the BE concludes that the Rosy Twisted Stalk will not be affected by the project.

### h. American False Hellebore (Sensitive)

Although the American False Hellebore was not found in the project area, it has been previously reported from several locations in this Brasstown Ranger District. The findings regarding the American False Hellebore parallel those in the BE for the Big Net Timber Project.

### i. Small Purple Fringed Orchid (Sensitive)

Although the Small Purple Fringed Orchid was not found in the project area, it has occurred in other locations in this Brasstown Ranger District. The findings regarding the Small Purple Fringed Orchid parallel those in the BE for the Upper Swallows Timber Project.

### j. Rafinesque's Big–Eared Bat (Sensitive)

The Rafinesque's Big–Eared Bat could potentially occur in this site as the habitat is suitable. The findings regarding the Rafinesque's Big–Eared Bat parallel those in the BE for the Compartment 05, Big Net, Tibbs Trail, and Upper Swallows Timber Projects.

### k. Pygmy Shrew (Sensitive)

The BE notes the Pygmy Shrew is "extremely rare." However, the Pygmy Shrew was found in the project area and has been found elsewhere in the Chattahoochee National Forest. The findings regarding the Pygmy Shrew parallel those in the BE for the Compartment 05 and Big Net Timber Projects.

### l. Masked Shrew (Sensitive)

The Masked Shrew is a high-elevation boreal species. The Masked Shrew has been found in Towns County in this Brasstown Ranger District in the past, including stands in the vicinity of the project area. The findings regarding the Masked Shrew parallel those in the BE for the Compartment 05 and Big Net Timber Projects.

### m. Diana Fritillary (Sensitive)

The findings regarding the Diana Fritillary butterfly parallel those in the BE for the Compartment 05, Big Net, Tibbs Trail, and Upper Swallows Timber Projects.

### n. Brook Trout (Sensitive)

The Brook Trout is present in Mossy Cove Branch, which flows through the project area. The BE reports "introductions of non-native rainbow and brown trout have reduce brook trout range on the Forest to less than 100 miles." The BE admits the "timber sale has the potential to create localized sediment which could impact this species." However, all activities will follow applicable Forest Wide Standards and Guidelines. These standards and guidelines are designed to ensure maintenance of water quality. Therefore, the BE concludes that the project is unlikely to adversely affect brook trout.

### o. Ruth's Sedge (Sensitive)

The BE reveals that the Ruth's Sedge is a Southern Appalachian endemic of bogs and seeps. Several large populations, as well as scattered individuals, of Ruth's Sedge were found in the project site. Although the Ruth's Sedge exists in the project area and would be impacted, the BE concludes that the viability of the Ruth's Sedge will be protected through employing mitigation measures.

### p. Rough Sedge (Sensitive)

The BE reveals that a population of 100 individual Rough Sedge were seen in the project area and would be impacted, but that the viability of the species will be protected through employing mitigation measures.

### q. Red Elderberry (Sensitive)

The BE reports that the Red Elderberry species was not found in the project area and thus will not be affected by the proposed project.

### 2. *BE's Summary of Impact on Endangered and Sensitive Species*

The BE acknowledges that there are a significant number and variety of sensitive species in the project area, but concludes that the project will not affect viability of the sensitive species because mitigation measures will be used to protect the Brook Trout, Manhart's Sedge, Ruth's Sedge, and Rough Sedge. Although individual members of the Yellow Lady's Slipper, Pink Lady's Slipper, Pygmy Shrew, Masked Shrew, and the habitat for these and the other sensitive species will be destroyed, the BE concludes that this will not affect viability of the species, as follows:

VII. CUMULATIVE EFFECTS

No federally listed plant species were found in the project area. Botanical surveys will be conducted on all high risk sites prior to all future activities and impacts on federally listed species will be avoided. Significant populations of sensitive plant species will be protected to maintain viability on the Forest. Therefore, cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect PETS plant species.

Habitat for Rafinesque's Big–Eared Bat and Diana Fritillary butterfly are found throughout the Chattahoochee National Forest. The project site contains no habitat specifically required by either of these species. As discussed above, the proposed action and similar future actions will not impact pygmy or masked shrew. Forest-wide water quality standards and guidelines will be followed in quality and habitat for PETS fish such

as the brook trout. Therefore, cumulative effects from past, present and reasonably foreseeable future actions will not adversely affect this PETS animals.

## VIII. DETERMINATION

The proposed action *will not affect* small whorled pogonia and *will not impact* golden seal, mountain maple, red elderberry, rosy twisted stalk, American False Hellebore, small purple fringed orchid, pygmy shrew, masked shrew, or brook trout. The proposed action *may impact* individuals of pink lady's slipper, yellow lady's slipper, Manhart's sedge, Ruth's sedge, rough sedge, and if present, Rafinesque's big-eared bat and Diana fritillary but is not likely to result in a trend to federal listing of any of these species under the Endangered Species Act or a loss of viability on the Forest.

### 3. *Environmental Assessment*

The EA assesses the impact of the South Corn Ridge Timber Project on, *inter alia*, biodiversity, wildlife habitat, and effects on PETS species. As with all other projects, the EA identifies as a significant issue whether the timber project will affect sensitive and endangered species. The EA notes that an inquiry had been made whether the Defendant Forest Service would be using any "current and updated inventories" on plant and animal communities in the Forest, but notes that this question had been decided by law and the Defendant Forest Service was not required to do this. EA, at p. 17.

The EA selects the following MIS species to examine the effects of this project on biodiversity: (1) Yellow Lady's Slipper, (2) Pileated Woodpecker, (3) Black Bear, (4) Gray Squirrel, (5) Trout, (6) Dusky Salamander, (7) White Tailed Deer, (8) Ruffed Grouse, (9) Wild Turkey, and (10) Indigo Bunting. The EA reveals that the no-action alternative maintains the levels of all of the MIS species existing in the project area. However, the EA indicates that proposed timber harvesting alternatives two, three, and four would maintain the levels of most of the MIS species in the project area while increasing the levels of

Ruffed Grouse and Indigo Bunting in the project area due to creation of early successional habitat.

The EA finds no significant adverse impact to the environment in terms of biodiversity, viability or PETS species, wildlife habitat, or any other respect. The EA does not contain any inventory or population data for the MIS species or the sensitive species located in the timber project area. Instead, the EA evaluates primarily whether the habitat capability for the listed MIS species will be maintained.

### 4. *Decision Notice and Finding of No Significant Impact*

On October 6, 1995, the District Ranger issued his Decision Notice and Finding of No Significant Impact. The District Ranger selected alternative four and found that the method represented thereby would result in no significant adverse effects on the environment. The decision was affirmed on appeal. The timber contract for the South Corn Ridge Timber Project has not been awarded.

### O. Dunaway Gap Timber Project

The Dunaway Gap Compartment of the Chattahoochee and Oconee National Forests is 4020 acres in Chatooga and Floyd Counties, Georgia. The Dunaway Gap Timber Project in this compartment includes the logging of 527 acres along the Johns Mountain in the Coosa River Basin. It involves the construction of 4.1 miles of road and a discharge of 37.8 tons of sediment, over existing amounts, into Armuchee Creek. Approximately 20.3 tons of this discharge will result from roads. On December 16, 1991, the District Ranger issued notice for this proposed timber project in the Dunuway Gap Compartment of the Armuchee District. The Armuchee Creek, a major perennial stream, runs through the project area.

### 1. *First Biological Evaluation*

On April 18, 1994, the first BE identifies the impacted sensitive and endangered

species in the Dunaway Gap Timber Project area as: (1) the Small Whorled Pogonia, (2) the Large Flowered Skullcap, (3) the Pink Lady's Slipper, (4) the Large–Leaved Phlox, (5) the Climbing Fern, (6) the Northern Pine Snake, (7) the Diana Fritillary, and (8) the Rafinesque's Big–Eared Bat.

### a. Small Whorled Pogonia (Endangered)

The BE indicates that the endangered Small Whorled Pogonia occurs in other Ranger Districts in this particular Forest, but was not observed in this timber project area. Thus, the BE reports that the project will not impact the Small Whorled Pogonia species.

### b. Large Flowered Skullcap (Endangered)

The BE notes that known specimens of the endangered Large Flowered Skullcap occur in ranges north and south of the Ranger District for this project, but that no specimens were known to exist in this range. Thus, the BE reports that the project would have no significant impact on the Large Flowered Skullcap.

### c. Pink Lady's Slipper (Sensitive)

The BE reports that the Pink Lady's Slipper is on the State list as "unusual" due to the threat of private collection for private gardens and medicinal purposes. Although none of the Pink Lady's Slipper was observed in the project area, the BE indicates that its habitat exists and could be found in unsurveyed stands in the project area. As with most of the BEs, the staff member did not field survey the entire project area, but conducted field samples of selected timber stands in the timber project site. The BE does not discuss a letter to the Forest Service in which a land owner stated "I have found a large colony of lady slippers in the area and I believe there to be many more in the project area." DG AR, Tab 5.

### d. Large–Leaved Phlox (Sensitive)

According to the BE, the Large–Leaved Phlox is rare in Georgia, noting that the first populations were discovered in the State only recently. Two populations of Large–Leaved Phlox have been discovered in this Forest recently. Habitat seems to occur along streams with adequate sunlight. The BE reports that the preferred habitat for the Large–Leaved Phlox does not exist in the project area and that no members of the species were observed. Thus, the BE indicates that the project will not significantly affect the Large–Leaved Phlox.

### e. Climbing Fern (Sensitive)

The BE reported that neither the preferred habitat nor the Climbing Fern was observed in the project area. Thus, the BE concludes that the Climbing Fern will not be affected by the project.

### f. Northern Pine Snake (Sensitive)

The BE concludes that the project area provides only marginal habitat for the Northern Pine Snake. The BE reports "the snake could potentially occur in the exchange area, but the site was not sampled for the species." The BE reports that the snake will not be affected by the project.

### g. Diana Fritillary (Sensitive)

The BE indicates that the Diana Fritillary butterfly could exist in the project area and, thus, could be affected by the project. However, because the species exists in the Forest, the BE concludes that viability of the species will not be affected by the project.

### h. Rafinesque's Big–Eared Bat (Sensitive)

The BE notes that there is potential habitat for the Rafinesque's Big–Eared Bat in hollow trees on the project site and that individual members of the species would be displaced if they were in a tree

that was cut. However, the BE concludes that the population viability of the Rafinesque's Big–Eared Bat will not be put in risk due to the timber project.

## 2. *Second Biological Evaluation*

On July 7, 1995, a second BE was completed to assess the impact of the timber project on additional sensitive species thought to exist or have potential habitat in the timber project site. The second BE examines: (1) the Upland Combshell, (2) the Southern Acronshell, (3) the Fine–Lined Pocketbook, (4) the Alabama Moccasin shell, (5) the Southern Club shell, (6) the Southern Pigtoe, (7) the Ovate Club shell, (8) the Triangular Kidneyshell, (9) the Tennessee Heelsplitter, (10) the Blue Shiner, (11) the Trispot Darter, (12) the Cherokee Clubtail Dragonfly, (13) the Pygmy Shrew, the (14) Yellow Lady's Slipper, and (15) the Golden Seal.

### a. Upland Combshell, Southern Acronshell, Fine–Lined Pocketbook, Alabama Moccasin shell, Southern Club shell, Southern Pigtoe, the Ovate Club shell, Triangular Kidneyshell, and Tennessee Heelsplitter (Endangered)

The BE first indicates these ten Coosa Basin freshwater mussels are endangered species that inhabit high quality streams and that high gradient streams like those in the project area are not conducive to mussels. However, several other non-sensitive species of mussels were found in the project area. The BE indicates that "the listed species of mussels could occur in the project area because the habitat for these species does occur." The BE recommends that mitigation measures to reduce impact be taken during the project.

### b. Blue Shiner (Endangered)

The BE reports that the endangered Blue Shiner may occur in East Armuchee Creek, but was not found in a survey of the project area. The Blue Shiner inhabits clear, swift water over sand, gravel, and coble substrates. The Blue Shiner prefers eddies and pools over sand bottoms more than rockier, swifter raceways.

### c. Trispot Darter (Sensitive)

The BE reports that the Trispot Darter does not prefer mountainous streams or lower temperatures and higher gradients, which exist in the project area. The Trispot Darter occupies the peripheral zones of the main channel in areas of slow current, gravel-silt substrate, and aquatic vegetative or leaf letter cover.

### d. Cherokee Clubtail Dragonfly (Sensitive)

The BE reports that the Cherokee Clubtail Dragonfly inhabits high quality streams and that historical records from the 1970s indicate the Cherokee Clubtail Dragonfly inhabited East Armuchee Creek. The BE does not report whether the Cherokee Clubtail Dragonfly was observed. However, the BE concludes that the project will not impact the dragonfly species.

### e. Pygmy Shrew (Sensitive)

The BE reports the Pygmy Shrew is widely distributed in a wide range of habitats and has been found in the Cohutta District. The BE concludes the "shrew could occur in the project area."

### f. Yellow Lady's Slipper (Sensitive)

The Yellow Lady's Slipper was previously reported to occur in stands 21 and 22 in Compartment 937, but was not found in the project area.

### g. Golden Seal (Sensitive)

The BE indicates that the Golden Seal is rare in the Armuchee Ranger District, but is known to occur on private lands near the project area. None was found on the project site prior to the BE.

## 3. *BE's Summary of Impact on Sensitive and Endangered Species*

The BE concludes as follows:

## V. POTENTIAL EFFECTS OF SPECIES AND HABITATS

Potential habitat for Yellow Lady's Slipper and Golden Seal may be present in the project area or in adjacent areas next to the project area, but they were not found during the survey. Therefore, the proposed project will not impact these species.

No federally listed species were found during field surveys of the project area and down stream for aquatic species. The only federally listed species that had potential to occur in the area is the blue shiner. However it was not found during the surveys. The blue shiner is not known to occur in East Armuchee Creek. The closed population is downstream on the Oostanaula River near Rome, Georgia. The listed species of mussels could occur in the project area but were not found during the field survey. The habitat for this species does occur. The proposed mitigation measures for the project including streamside management zones and road locations and construction will ensure an insignificant amount of impact on the habitat.

The only sensitive mussel addressed in the amendment is the Tennessee heelsplitter. It was not found during a field survey on East Armuchee Creek but was found on West Armuchee Creek. Therefore, the proposed activities will not impact this species.

One sensitive fish was included in the analysis, the trispot darter. It was not found in the project area but this does not preclude it from occurring. The proposed mitigation measures for the project including streamside management zones, road locations and construction will ensure activities will not impact this species.

The pygmy shrew has the most potential to occur in the project area. This shrew can be found in a wide range of successional stages in a variety of forest habitats. Harvest activities would not impact the shrew if it were present in the area. Prescribed burning could possibly impact an individual if it were caught in the fire. However, according to Dr. Laerm, there is increasing evidence that this species is widespread and that there is little justification for considering it to be rare enough to require listing by USFWS or by the state. Therefore, impact of the proposed activities on these individuals would not threaten their viability on the Forest.

. . . .

## VII. DETERMINATION OF EFFECT

The proposed actions *will not likely to adversely affect* [sic] the mollusks and the blue shiner. When this determination is made, written concurrence is required for the USFWS. The proposed action will not impact the Tennessee heelsplitter, Cherokee clubtail dragonfly, trispot darter, yellow lady-slipper or Goldenseal. The project may impact individuals of the pygmy shrew, if any are present. It is not likely to result in a trend to federal listing of this species under the Endangered Species Act, or a loss of viability on the Forest.

### 4. *Environmental Assessment*

On August 17, 1995, the District Ranger released the EA, which assessed the effects of four different alternatives, including a no-action alternative, on the timber project area. The EA assessed impacts in terms of biodiversity, wildlife habitat, and effects on PETS species.

#### a. Management Indicator Species

The EA chose these MIS species for the Dunaway Gap Timber Project: (1) the Pileated Woodpecker, (2) Fox and Gray Squirrel, (3) Dusky Salamander, (4) Coosa Darter, (5) Deer, (6) Turkey, and (7) Indigo Bunting.

The EA reports that alternative three, which was ultimately selected, would meet the habitat objectives of the MIS. Alternative three would favor the early successional wildlife species, i.e. Deer and Indigo

Bunting. The Dusky Salamander and Coosa Darter habitat would be protected by prohibiting the cutting along streamside zones. Pileated Woodpeckers would still have many other acres of good hardwood habitat in the District.

Relying on the earlier completed BEs, the EA concludes that the timber projects will not have any effects on the viability of any sensitive species in the area.

### 5. Decision Notice and Finding of No Significant Impact

On November 6, 1995, the District Ranger issued his Decision Notice and Finding of No Significant Impact. The District Ranger selected alternative three and determined that this alternative did not adversely affect the environment in any significant way. The FONSI decision was affirmed on appeal. The timber contract has not been awarded on the Dunaway Gap Timber Project.

### P. Compartment 59 Timber Project

Compartment 59 of the Chattahoochee and Oconee National Forests is located approximately nine miles east of Clayton, Georgia, bound on the southeast by the Chattooga River and on the east by U.S. Highway 76, and on the north by unnamed tributaries of Stekoa Creek. The Compartment 59 Timber Project involves logging of 314 acres in the Chattooga River Basin. It involves one mile of road to be built and a discharge of 22.5 tons of sediment, over existing amounts, into Stekoa Creek and its tributaries. Approximately six tons of discharge will result from roads.

On July 1, 1991, the District Ranger issued notice of a proposed timber project in Compartment 59 of the Tallulah Ranger District of the Chattahoochee and Oconee National Forests. Part of Compartment 59 to be harvested borders the Chattooga River, which Congress designated as a National Wild and Scenic River. One stand in the project borders Stekoa Creek, a tributary of the Chattooga River, which is already polluting the Chattooga River. Sedimentation is the largest pollutant to the Chattooga River. This project appears to have the most vigorous objections sent to the Forest Service about proposed timber harvesting, due to the pending federal legislative proposals to put the majority of this Ranger District into wilderness.

### 1. Biological Evaluations

A 1992 BE and a 1995 BE were completed for the Compartment 59 Timber Project. The first BE identifies these impacted endangered and sensitive species in the Compartment 59 Timber Project: (1) the Small Whorled Pogonia, (2) the Yellow Lady's Slipper, (3) the Large Whorled Pogonia, (4) the American Ginseng, (5) the Turkeybeard, (6) the Southeastern Shrew, and (7) the Northern Pine Snake. The second BE identifies these: (1) the Rafinesque's Big–Eared Bat, (2) the Diana Fritillary, (3) the Masked Shrew, and (4) the Pygmy Shrew.

#### a. Small Whorled Pogonia (Endangered)

The BE notes that the endangered Small Whorled Pogonia has been found in six locations in the Chattahoochee National Forest. The BE describes the preferred habitat of the endangered Small Whorled Pogonia as flat, hardwood-conifer stands that are usually in second or third growth successional stages, and dry ridgetop sites. After noting that further studies are needed to delineate the specific habitat needs of the species, the BE informs that the Small Whorled Pogonia was not observed in the project area. Because no Small Whorled Pogonia were found on the site, the BE concludes that there will be no adverse effects on this species.

#### b. Yellow Lady's Slipper (Sensitive)

The BE notes the Yellow Lady's Slipper is found throughout North Georgia and the Upper Piedmont in moist deciduous woods, in ravines, or on north-facing slopes. The Yellow Lady's Slipper was not found in the project area. While present throughout the Forest, it is listed on the State list as

"unusual" due to the threat of private collection for gardens and for medicinal purposes. Because the Yellow Lady's Slipper was not found in the project area, the BE concludes that it will suffer no adverse effects.

### c. Pink Lady's Slipper (Sensitive)

The BE notes that the Pink Lady's Slipper is also common throughout the Chattahoochee National Forest. Hundreds of the species were found within Compartment 05. However, the Pink Lady's Slipper is also listed on the State list as "unusual" due to the threat of collection for private gardens and for medicinal purposes. *The BE notes that there is little documentation of what effects timber harvesting would have on the Pink Lady's Slippers and that the Compartment 05 Timber Project (where Pink Lady's Slippers were found) provides an excellent opportunity for monitoring the effects of timber management activities on the Pink Lady's Slippers.* The BE concludes that, while habitat for the Pink Lady's Slipper was present and was found on the project site, the relative abundance of the species would ensure population viability.

### d. Large Whorled Pogonia (Sensitive)

The BE reports that the Large Whorled Pogonia is thought to be present in the Chattahoochee National Forest. It occurs in dry, open flat ridges in oak-pine forests or in mountain bogs. The Large Whorled Pogonia was not located on the project site. The BE does not indicate whether the Large Whorled Pogonia is populous enough in other parts of the forest to ensure population viability. The BE notes only that two colonies of Large Whorled Pogonia recently were discovered in the Toccoa and Chestatee Ranger Districts.

### e. American Ginseng (Sensitive)

The BE notes that the American Ginseng is known to occur throughout the North Georgia Mountains. However, because the American Ginseng was not located on the project area, the BE concludes that the American Ginseng will not be affected by the proposed action.

### f. Turkeybeard (Sensitive)

The BE reports that the Turkeybeard is known in Georgia from State land along the Amicalola River, and from Forest Service land along the Conasuaga River. The BE indicates that the project area provides only marginal habitat for the Turkeybeard and that none was observed. Thus, the BE concludes that the Turkeybeard will not be impacted by the timber project.

### g. Southeastern Shrew (Sensitive)

The BE notes a potential habitat for the Southeastern Shrew in the project area, but that the area was not sampled for the Southeastern Shrew. *The BE notes that the status of the Southeastern Shrew throughout the range is yet to be determined.* The BE concludes that while the project may impact members of the Southeastern Shrew, overall viability in the forest would not be placed at risk.

### h. Northern Pine Snake (Sensitive)

The BE notes that the Northern Pine Snake occurs from New Jersey to Tennessee, Northern Georgia, and Alabama, and is thought to occur throughout the Chattahoochee/Oconee National Forests. However, the BE notes that the Georgia Freshwater Wetlands and Heritage Inventory ("GFWHI") had no records for this northern subspecies, although there was a recent report from Northwestern Georgia and a road-specimen from Northwestern South Carolina in the 1960s. The BE concludes that Compartment 05 provides little suitable habitat for the snake. The area was not sampled for the snake, but the BE concludes that there is a low likelihood of its presence. Accordingly, the BE concludes that while it is possible that the project could affect individual members of the Northern Pine Snake, the project will not affect the population viability of the Northern Pine Snake.

### i. Rafinesque's Big–Eared Bat (Sensitive)

The BE notes that these bats typically roost and hibernate in caves and old buildings, none of which are on the site. However, they also have been found in hollow trees, which gives them potential to occur in the project area. The BE concludes, however, that while an individual bat will be displaced if it is present in a tree that is burned or cut, the project will not significantly affect population viability.

### j. Diana Fritillary (Sensitive)

The BE notes that the Diana Fritillary butterfly occurs throughout the Southern Appalachians, inhabiting pine and deciduous forests near streams. The BE notes reports of the butterfly from 1965, 1967, and 1972. A female Diana Fritillary was seen in the Tallulah Ranger District in 1993. Because the habitat for the Diana Fritillary exists throughout the Forest, the BE concludes that population viability will not be affected.

### k. Masked Shrew (Sensitive)

The BE notes potential habitat for the Masked Shrew in the project area, but that no survey in the project area was done to observe it. The BE finds that habitat suitability could be reduced in the short term, but would increase shortly thereafter. The BE concludes that while individuals of the species may be adversely affected, population viability for the Forest will not be affected.

### l. Pygmy Shrew (Sensitive)

The BE reports potential habitats for the Pygmy Shrew in the project area but that no surveys have been conducted. The BE draws the same conclusions about the Pygmy Shrew as about the Masked Shrew.

### 2. BE's Summary of Impact on Sensitive and Endangered Species

The BE concludes that no PETS species will be adversely affected in terms of population viability, as follows:

VI. CONCLUSIONS

The proposed action will not affect any of the PETS plant species, and may affect the individuals of Southeastern shrew, and northern pine snake, but is not likely to affect their viability on the Forest, nor contribute to their listing under the ESA in the future....

CUMULATIVE EFFECTS

Potential habitat for Rafinesque's big-eared bat, Diana fritillary butterfly, Masked and Pygmy Shrew are found throughout the Chattahoochee National Forest. The project site contains no habitat specifically required by any of these species. Cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect these PETS species viability on the Forest.

DETERMINATION OF EFFECTS

The proposed action *may impact* individual Rafinesque's big-eared bat, Diana fritillary butterfly, Masked and Pygmy shrew if they are present, but is not likely to result in a trend to federal listing of any of these species under the Endangered Species Act or a loss of viability on the Forest.

### 3. Environmental Assessment

In May, 1992, the Forest Service completed the EA for the Compartment 59 Timber Project. The EA assesses the impacts of four different alternatives, including a no-action alternative, on the project area. The EA addresses biodiversity, wildlife habitat, and effects on PETS species.

### a. Management Indicator Species

The EA estimates effects of the proposed alternatives on wildlife habitats by estimating the effects of the project on certain MIS species. The MIS chosen for the Compartment 59 Timber Project include: (1) the Yellow Lady's Slipper, (2) the Pileated Woodpecker, (3) the Black Bear, (4) the Gray Squirrel, (5) the Brown and Rainbow Trout, (6) the Dusky Sala-

mander, (7) the Deer, (8) the Grouse, (9) the Turkey, and (10) the Indigo Bunting.

The EA reports that species that require middle to late successional habitat would benefit most from this project that involves thinning, seedtree cutting, shelterwood cutting, and only 15 acres of clearcutting. Species dependent upon openings, edge, a mixture of habitats, and a variety of forest types will be maintained or experience a slight decline as a result of the small amount of openings created in this alternative. The MIS species that heavily utilize early seral stage habitats and forest edge habitats will not benefit as much. Comp. 59 EA, at 41–42.

### 4. *EA's Summary of Impact on PETS Species*

The EA reports no findings of significant effects on any PETS species. In fact, while the text of the EA mentions the probable effects of the proposed project on some PETS species, the EA does not contain a section actually discussing the effects of the proposed project on PETS species.

### 5. *Decision Notice and Finding of No Significant Impact*

On July 13, 1992, the Forest Supervisor issued the Decision Notice selecting alternative four and Finding of No Significant Impact. The Forest Supervisor cites the BE, as opposed to the EA, in support of this conclusion. The FONSI decision was affirmed on appeal. On August 21, 1995, the timber contract for the Compartment 59 Timber Project was awarded to Thrift Brothers Lumber Company.

## II. CONCLUSIONS OF LAW

### A. Standards for Preliminary Injunctive Relief

■ To establish entitlement to a preliminary injunction, Plaintiffs must establish four elements: (1) a substantial likelihood that Plaintiffs will ultimately prevail on the merits; (2) that Plaintiffs will suffer irreparable harm if the injunction is not issued; (3) that the threatened injury to Plaintiffs outweighs the potential harm to Defendants if the injunction is issued; and (4) that the injunction, if issued, would not be adverse to the public interest. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters Local No. 70*, 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *Church v. Huntsville*, 30 F.3d 1332, 1343 (11th Cir.1994); *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1561–62 (11th Cir. 1989), *aff'd*, 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991). The Court discusses the merits of Plaintiffs' claims (1) first under the Clean Water Act and (2) then collectively under the National Environmental Policy Act, the National Forest Management Act, the regulations thereunder, and the Forest Plan.

### B. Clean Water Act Excludes Harvesting And Logging Roads

■ Plaintiffs emphasize that these seven timber projects will discharge tons of sediment into streams and rivers that run through or near the seven timber project sites. Plaintiffs contend that the Defendant Forest Service and the Intervenors have violated the Federal Water Pollution Control Act ("Clean Water Act"), 33 U.S.C. §§ 1251–1387, because they have not obtained a permit to discharge this sediment into these waterways. Plaintiffs do not assert that the timber harvesting itself is covered by the Clean Water Act, but instead argue that the logging roads in the timber project areas constitute "point sources" regulated by the Clean Water Act. However, as the Federal Defendants and the Intervenors correctly explain, the Clean Water Act provides that logging roads are "non-point" sources and are exempted from the Clean Water Act's permit requirements.

### 1. *General Requirements of Clean Water Act*

The Clean Water Act prohibits the discharge of any pollutant, by any person, into any waterway of the United States,

unless the discharge is pursuant to the terms of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. § 1311(a); *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1524 (11th Cir.1996). NPDES permits are usually available from the Environmental Protection Agency ("EPA"); however, Section 1342(c)(1) of the Clean Water Act suspends the availability of federal permits once a state permitting program has been submitted and approved by the EPA. *See* 33 U.S.C. § 1342(c)(1); *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306; *Hughey*, 78 F.3d at 1525. The EPA authorized Georgia's Department of Natural Resources, Environmental Protection Division ("EPD") to administer the NPDES permit program.

To be required to obtain a permit, the person must be releasing pollutants into one of the waterways of the United States from a "point source." 33 U.S.C. § 1362(12).[5] Section 1362(12) defines the term "discharge of a pollutant" and the term "discharge of pollutants" as "(A) any addition of any pollutant to navigable waters from *any point source,* (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from *any point source* other than a vessel or other floating craft." *Id.* (emphasis supplied). The parties agree that if the source of a pollutant being discharged to a waterway is not a "point source," it is not a "discharge of pollutants" for purposes of the Clean Water Act.

However, the parties disagree over what is considered a "point source" under the Clean Water Act. The Clean Water Act defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or oth-

er floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The definition excludes from its ambit "return flows" from irrigated agriculture. The regulations, promulgated pursuant to the Clean Water Act, further explain what does and does not constitute a point source under this statutory definition.

### 2. Only Four Silvicultural Activities Constitute "Point Sources"

The regulations, promulgated pursuant to the Clean Water Act, specifically discuss what are "point sources" and "non-point sources" for purposes of silvicultural activities. "Silvicultural activities" are activities relating to the establishment, development, reproduction, or care of forest trees. According to the regulations, "silvicultural point source" means "any discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States." 40 C.F.R. § 122.27.

The regulations define "rock crushing and gravel washing facilities" as "facilities which process crushed and broken stone, gravel, and riprap...." 40 C.F.R. § 122.27. The regulations define "log sorting and log storage facilities" as "facilities whose discharges result from the holding of unprocessed wood, for example, logs or roundwood with bark or after removal of bark held in self-contained bodies of water (mill ponds or log ponds) or stored on land where water is applied intentionally on the logs (wet decking)." *Id.*

The regulations expressly provide that the term "silvicultural point source" does not include "non-point source silvicultural

---

5. Assuming pollutants are being discharged into the waterways of the United States from discrete point sources, the regulations mandate that the operator of the facility from which the pollutants originate is required to obtain the NPDES permit, not the owner of

the land from which the pollutants originate. 40 C.F.R. § 122.21 ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit.").

activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or *road construction and maintenance* from which there is natural runoff." *Id.* (emphasis supplied). However, "some of these activities (such as stream crossing for roads) may involve point source discharges of dredged or fill material which may require a CWA section 404 permit. . . ." *Id.*

On the facts of this case, Defendants do not dispute that their actions have resulted in and will continue to result in pollutants being discharged into various waterways of the United States. It is also undisputed that Defendants have not and do not intend to procure NPDES permits authorizing them to discharge pollutants into the waterways of the United States. Rather, Defendants argue that they are not in violation of the Clean Water Act because they are not discharging pollutants from "point sources" as that term is defined in the Clean Water Act and the implementing regulations.

According to these regulations, only discernible conveyances related to rock crushing, gravel washing, log sorting, and log storage constitute point sources for purposes of silvicultural activities. It is clear that neither Defendants nor the timber contractors are engaging in rock crushing or gravel washing. Also, Plaintiffs do not allege that Defendants or the timber contractors are engaging in log sorting or log storage as those terms are defined in the regulations.

Instead, Plaintiffs' main contention is that the regulation governing silvicultural activities does not contain an exhaustive list of what constitutes point sources for purposes of silvicultural activities, but only lists examples. However, Defendants correctly submit that the regulations do not contain language conveying an intent to list examples, e.g., "such as," "including," or "like." Instead, the regulations expressly define what constitutes a silvicultural point source and thereby limits what can

constitute a silvicultural point source by defining it as a discernible, confined or discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage. The language of the regulations does not state that conveyances from other activities or sources may constitute point sources.

Indeed, the legislative history and the implementing regulations of the Clean Water Act show that Congress and the Environmental Protection Agency intended to exempt most silvicultural activities from the Clean Water Act's permit requirements. In issuing the regulation governing silvicultural activities, the EPA made clear that the list of point sources identified in the regulation is exhaustive, as follows:

> Only discharges from a few silvicultural activities meeting certain criteria are considered point sources subject to the permit program. These activities are rock crushing, gravel washing, log sorting, and log storage operations.

41 Fed.Reg. 24710–11 (1976). Thus, "only discharges from four activities related to silvicultural enterprises, rock crushing, gravel washing, log sorting, and log storage facilities, are considered point sources and thus subject to NPDES permitting requirements." 41 Fed.Reg. 24710 (1976). Because none of the discharges about which Plaintiffs complain relates to rock crushing, gravel washing, log sorting, or log storage facilities, they are "non-point" sources for purposes of the Clean Water Act and do not require an NPDES permit.

### 3. *Road Construction and Maintenance are Non–Point Sources*

Moreover, the activity that Plaintiffs complain results in the most discharge, namely the logging road construction, is specifically exempt from the Clean Water Act's permit requirement. The EPA has clarified that natural runoff from road construction and maintenance constitutes a nonpoint source as follows:

Although runoff from road construction and maintenance for the purposes of forest management falls more generally under the characteristics of nonpoint source pollution, no such reference was made in the proposed regulations. This omission has been remedied and runoff from road construction and maintenance has been added to the list of nonpoint sources . . . .

41 Fed.Reg. 24711 (1976). Finally, the EPA recently reconfirmed that forest roads are non-point sources not subject to the NPDES program. *See* 60 Fed.Reg. 50835 (1995) (noting that the nonpoint silvicultural sources identified in 40 C.F.R. § 122.27, which includes "road construction and maintenance," do not require NPDES permits).

Plaintiffs proffer three theories in support of their claim that the roads here do not fall within § 122.27's exemption for road construction and maintenance. First, Plaintiffs argue that the logging roads will remain after the timber harvesting is complete and then will constitute point sources. However, Defendants and the Intervenors correctly respond that the regulations expressly exempt these roads and it would serve no purpose to exempt them during the logging but then require a permit once the logging stops. In that event, the contractor would have to get the permit from the start. In any event, the Court finds that the current evidence in the record does not show that Plaintiffs have a substantial likelihood of prevailing on this contention.[6]

Second, Plaintiffs argue that the runoff from the logging roads in issue will cause "unnatural" as opposed to "natural" runoff and, thus, becomes a point source for purposes of the Clean Water Act. Again, there is not sufficient evidence in the record to grant a preliminary injunction on this claim. Moreover, reading the exemption for road construction and maintenance as narrowly as Plaintiffs urge would run counter to the EPA's intent to exclude timber harvesting and road construction and maintenance and to limit the Clean Water Act's permit requirement to only a few silvicultural activities.

Finally, Plaintiffs claim that the logging roads in issue are not exempt from the Clean Water Act's requirements because once created, the roads are used primarily for recreational activities, law enforcement, or public access. However, while Plaintiffs cite one reference in the Administrative Record for the Big Net Timber Project which indicates that forest roads in that project area are employed for multiple purposes, Plaintiffs point to no similar evidence in the other six timber project areas. Further, Plaintiffs do not dispute that the roads were created for timber harvesting and that they are used for timber harvesting. It would circumvent the EPA's intent to limit the Clean Water Act's permit requirement to a few silvicultural activities if forest roads constituted point sources because they are used for other purposes *in addition to* timber harvesting. *See Oregon Natural Resources Council v. United States Forest Serv.,* 834 F.2d 842, 848–49 & n. 9 (9th Cir.1987) (road building associated with timber sales does not constitute point source); *Shanty Town Assocs., Ltd. v. EPA,* 843 F.2d 782, 789 n. 10 (4th Cir. 1988) ("Nonpoint source pollution is runoff from agriculture, silviculture, mining, construction, roads, urban development, and other diffuse sources.").

---

6. Plaintiffs stress that after the logging roads are built, the roads will continue to erode, ditches will develop, and ditches and pipes along the roads can become point sources. Plaintiffs simply have not developed sufficient evidence of this occurring in the record at this juncture for this Court to be able to find a substantial likelihood of success on the merits at this time. Of course, discovery continues and the issue will be examined again when the record on the Clean Water Act claim is completed. For example, Plaintiffs claim the logging roads may have pipes and culverts placed under them and along the road which later can become discernible point sources. However, Plaintiffs have the burden on this issue and the Court cannot locate any maps or road design plans showing such pipes or culverts in the current record.

### 4. Plaintiffs' Claims Regarding Stream Crossings and Yarding Areas, Spoil Piles, and Other Related Activities

Regarding Plaintiffs' argument that pollutants are not being discharged from silvicultural areas, but rather from other areas, the Court finds that Plaintiffs have not shown a substantial likelihood of success on this claim at this juncture. Plaintiffs argue that discharges from "stream crossings, yarding areas, spoil piles and other related grading and construction projects" are not controlled by the regulation addressing silvicultural activities, and that these discharges are from point sources and, thus, require a NPDES permit. The Court disagrees.

Plaintiffs first claim that stream crossings (for the logging roads) constitute point sources. However, the Intervenors note that stream crossings are not listed in the regulation governing silvicultural activities and, thus, are non-point sources. Also, while the regulations state that stream crossings (for roads) may constitute point sources if they involve discharges of dredged or fill material, no such discharges are at issue here. Thus, Plaintiffs' claim that any stream crossings constitute point sources is without merit.

Yarding areas also are non-point sources. According to the Intervenors, yarding areas are an integral part of timber harvesting operations. The Intervenors assert that "harvesting" includes all "measures employed directly upon ... forest ... crops within established ... silvicultural lands to bring about their removal" from the lands. 36 C.F.R.

§ 323.3(d)(2). The Intervenors stress that the EPA recently explained that non-point silvicultural activities include the "incidental stacking and temporary storage of harvested timber on the harvest site prior to its initial transport to either an intermediate storage area or other processing site." 60 Fed.Reg. 50835 (1995). This describes the yarding area and its functions. Thus, considering yarding areas point sources for purposes of the Clean Water Act would not comport with the EPA's intent to limit the Clean Water Act's permit requirement to a limited number of silvicultural point sources, and would run counter to the regulation specifically exempting timber harvesting activities.

As for Plaintiffs' claims regarding spoil piles and other related grading, logging, and construction activities, Plaintiffs do not point to any evidence in the record of such activities. Further, inasmuch as none of these activities is listed as a silvicultural point source in the regulation governing silvicultural activities for purposes of the Clean Water Act, a finding that such activities are point sources would contravene the EPA's narrow interpretation of what constitutes a silvicultural point source for purposes of the Clean Water Act.

### 5. Plaintiffs' Cases Inapplicable

Finally, none of the "point source" cases which Plaintiffs cite applies to the facts of this case. First, only one of the cases Plaintiffs cites, *Avoyelles Sportsmen's League v. Marsh*, 715 F.2d 897 (5th Cir. 1983), involves point sources within the silvicultural context.[7] Even *Avoyelles*,

---

**7.** All the other cases cited by Plaintiffs dealt with point sources in other contexts. For example, *United States v. Holland*, 373 F.Supp. 665 (M.D.Fla.1974), involved the identification of point source equipment in landfilling operation in a wetland; *United States v. Weisman*, 489 F.Supp. 1331 (M.D.Fla.1980), involved the identification of point source equipment used to build a road across a wetland to a private residence; *O'Leary v. Moyer's Landfill, Inc.*, 523 F.Supp. 642 (E.D.Pa.1981), concerned the failure of a leachate collection system at a landfill; *Sierra Club. v. Abston Construction Co.*, 620 F.2d 41 (5th Cir.1980), involved runoff for a spoil pile

and an overflowing sediment basin at a coal mine; *United States v. Tull*, 615 F.Supp. 610 (E.D.Va.1983), aff'd, 769 F.2d 182, rev'd, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), dealt with an unpermitted discharge of fill material into wetlands to develop mobile home sites; *United States v. Earth Sciences, Inc.*, 599 F.2d 368 (10th Cir.1979), dealt with discharges of sodium cyanide-sodium leachate solution from a failed sump and gold mine; *Residents Against Industrial Landfill Expansion v. Diversified Systems*, 804 F.Supp. 1036 (E.D.Tenn.1992), involved discharges from sediment ponds on industrial

however, is inapplicable because it dealt with point sources under a provision of the Clean Water Act under which Plaintiffs do not proceed. *Avoyelles* dealt with point sources in an action brought in relation to § 404 of the Clean Water Act, whereas Plaintiffs bring this action alleging violations of § 402 of the Clean Water Act. What are and are not allowable discharges is different in § 404 than in § 402.

In sum, while the Court expresses no opinion whether Plaintiffs' Clean Water Act claim ultimately might prove meritorious, the Court finds that, at this juncture, Plaintiffs have not met their burden to show a substantial likelihood of success on the merits of their Clean Water Act claim against Defendants.

### C. Plaintiffs' Claims Under NEPA, NFMA and Forest Plan are Ripe and Plaintiffs Have Standing

Before reaching the merits of Plaintiffs' claims under the National Forest Management Act, the Court addresses the Defendants and Intervenors' contention that Plaintiffs cannot challenge site-specific projects under the regulations Plaintiffs cite in support of their claim for relief, namely 36 C.F.R. §§ 219.12 & 219.26. The Defendants and Intervenors argue that challenges under the NFMA, and specifically these regulations, can be brought only to attack the Forest Plan itself, as opposed to the site-specific projects in the National Forests. Apparently, the Defendants and Intervenors contend that it is too late to challenge the Forest Plan and the Defendant Forest Service for not following these regulations. The Court disagrees.

The National Forest Management Act envisions a two-stage approach to forest planning. *Inland Empire Pub. Lands v. United States Forest Serv.,* 88 F.3d 754, 757 (9th Cir.1996); *Sierra Club v. Espy,* 38 F.3d 792, 795 (5th Cir.1994); *see also Wilderness Soc'y v. Alcock,* 867 F.Supp. 1026 (N.D.Ga.1994) (opinion of Judge Evans),

*aff'd, Wilderness Soc'y v. Alcock,* 83 F.3d 386, 390 (11th Cir.1996) (discussing decision-making taking place in the second stage). At the first stage, "a team ... develops a proposed [Land Resource Management Plan ("LRMP") ] together with a draft and final [Environmental Impact Statement]." *Inland Empire,* 88 F.3d at 757 (quoting *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1511 (9th Cir. 1992)). Once the LRMP is approved, "[d]irect implementation of the LRMP occurs at a second stage, when individual site-specific projects are proposed and assessed." *Inland Empire,* 88 F.3d at 757 (quoting *Mumma,* 956 F.2d at 1512). These site-specific projects must be consistent with the stage one, forest-wide plan. *Inland Empire,* 88 F.3d at 757; *Espy,* 38 F.3d at 795 ("Site specific analysis ... must be consistent with the LRMP."); *Sierra Club v. Robertson,* 28 F.3d 753, 757 (8th Cir.1994); *Mumma,* 956 F.2d at 1512.

Recent rulings by the Eleventh Circuit and the district court in *Wilderness Society v. Alcock, supra,* confirm that the proper time to challenge a forest plan and site-specific decisions under the NFMA is when a second-stage site-specific decision has been made under that forest plan. In *Wilderness Society v. Alcock,* 867 F.Supp. 1026 (N.D.Ga.1994), the plaintiffs sued under the NFMA challenging the 1986 Final Land and Resource Management Plan for the Cherokee National Forest. The plaintiffs alleged, *inter alia,* (a) that the plan failed to provide for animal and plant species diversity as required by the NFMA; and (b) that, in formulating the plan, the Forest Service failed to conduct species inventories as required by the NFMA. *Id.* at 1034–36. However, District Court Judge Orinda Evans never reached the plaintiffs' claims on the merits, finding that the plaintiffs lacked standing under the NFMA, and that their claims were not ripe. *Id.* at 1041, 1042. Judge Evans

---

landfill; *Concerned Area Residents for the Environment v. Southview Farm,* 34 F.3d 114 (2d Cir.1994), dealt with an animal feed lot.

based her ruling on the fact that no site-specific decisions had been made by the defendants under the plan. *Id.* at 1041–42. Accordingly, Judge Evans found that the plan itself did not represent a threat of actual or imminent injury to the plaintiffs, an absolute predicate for both standing and ripeness. *Id.* at 1042. However, Judge Evans pointed out that "[s]hould Plaintiffs find that a particular proposed development in the Forest under the Plan is objectionable, there would be no impediment to judicial review at that time." *Id.* at 1041.

Not reaching the standing issue, the Eleventh Circuit affirmed Judge Evans's ruling on the ripeness issue. *Wilderness Soc'y v. Alcock,* 83 F.3d at 390 ("Because we find the framework of the ripeness doctrine more useful when evaluating injuries that have not yet occurred, such as those claimed by appellants here, we affirm the district court on that basis."). The Eleventh Circuit was persuaded by the Forest Service's argument that "no site specific action [would] be taken pursuant to the Plan without a second level of decisionmaking; 'subsequent discretionary actions require separate and independent decisionmaking' before any site specific action will occur." *Id.* at 390 (quoting *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 892 n. 3, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

The Court notes here that, standing and ripeness aside, there is no impediment in this case to Plaintiffs' challenging either the Forest Plan itself or site-specific decisions made pursuant to the Forest Plan under the National Forest Management Act. Assuming *arguendo* that Plaintiffs show imminent injury, there is no question that the Defendants' approval of the Forest Plan and the site-specific decisions are

final agency actions for purposes of the APA. *Wilderness Soc'y v. Alcock,* 867 F.Supp. 1026, 1041 (N.D.Ga.1994). Here, Plaintiffs have shown that they will be adversely affected by this final agency action. Accordingly, Plaintiffs may seek judicial review of either of the final agency actions under the APA. *See* 5 U.S.C. § 704. In other words, the *only* obstacle to Plaintiffs' seeking judicial review is the Constitution's justiciability requirement. *See* U.S. CONST. art. III, § 2.[8]

Thus, the question becomes whether Plaintiffs have standing to challenge the Forest Plan at the first stage (approval of the Plan itself) or the second stage (site-specific decisions), and whether Plaintiffs' claims here would be ripe at either stage. The Eleventh Circuit recently held that any challenge to the approval of the Forest Plan at the first stage would not be ripe for judicial review. *Wilderness Soc'y v. Alcock,* 83 F.3d at 390. Thus, the issue here is whether Plaintiffs' challenges to the Forest Plan at the second stage (site-specific decisions) are ripe for judicial review and whether Plaintiffs have standing to bring that claim.

In her order in *Wilderness Society,* Judge Evans opined that neither standing nor ripeness would impede the plaintiffs' efforts there to obtain later judicial review of site-specific decisions made pursuant to the plan for the Cherokee National Forest. *Wilderness Soc'y v. Alcock,* 867 F.Supp. 1026, 1041–42 (N.D.Ga.1994); *see also Inland Empire Pub. Lands v. United States Forest Serv.,* 88 F.3d 754, 760 n. 6 (9th Cir.1996). This Court agrees.

First, in *Wilderness Society,* the Eleventh Circuit noted that standing relates more to whether a plaintiff is the proper party to bring a certain claim, while ripe-

---

8. In other words, to the extent Defendants and Intervenors attempt to argue that Plaintiffs cannot challenge site-specific projects under the National Forest Management Act, but rather can challenge only the Forest Plan itself, the Court rejects that argument. The Court finds that Plaintiffs are challenging site-specific decisions made under the Forest Plan

and, thus, are challenging the Forest Plan itself. To be sure, to accept the full import of the Defendants' argument would be to construe the National Forest Management Act as allowing challenges to a Forest Plan only at a time when the Court would not have jurisdiction over that challenge for lack of ripeness.

ness focuses on the timing of the complaint. *Wilderness Society v. Alcock*, 83 F.3d 386, 390 (11th Cir.1996). There can be no question, especially in light of the Eleventh Circuit's opinion in *Wilderness Society*, that if any time is the appropriate time to bring a challenge to the Forest Plan, it is at the site-specific decision stage. Any challenge brought prior to this time would not be ripe; and any challenge brought after the decision has been implemented and carried out would be moot (and too late). Clearly, Plaintiffs' challenges to the seven timber projects here are ripe.

■ Also, Plaintiffs have standing to challenge the seven timber projects. As the Court noted in its previous Order granting Plaintiffs' Motion for a Preliminary Injunction on their claim relating to the Migratory Bird Treaty Act, Plaintiffs have shown that they have various recreational, aesthetic, business and/or environmental interests that have been and will be adversely affected by Defendants' actions.[9] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("Of course, the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of

standing."); *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *see also Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933 (9th Cir.1987), "[c]ourts have found personal injury in a variety of settings in which recreational uses of natural resources are at stake." *Id.* at 937; *see also United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Further, the Court finds that Plaintiffs' interests are within the zone of interests protected by the NFMA, and that Plaintiffs' interests are not a generalized grievance shared by a large class of citizens. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).[10]

For each of the reasons discussed above, the Court finds that Plaintiffs' claims are ripe and Plaintiffs have standing to challenge the site-specific decisions the Defendants made under the Forest Plan. Additionally, the Court finds that the proper time to challenge the Forest Plan, and Defendants' actions under the Plan, for failing to comply with applicable provisions of the NFMA and the regulations promulgated thereunder is now, at the stage two site-specific decision stage.

9. The Supreme Court has recognized that the provision of the APA authorizing a person to seek judicial review of an agency action if that person has suffered a legal wrong or has been adversely affected or aggrieved by an agency action defines when a person has standing for purposes of bringing a claim under the APA. *See, e.g., Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 115 S.Ct. 1278, 1283–84, 131 L.Ed.2d 160 (1995); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Heckler v. Chaney*, 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). A finding of standing is typically contingent on a plaintiff's showing (a) a personal injury, (b) that is fairly traceable to the defendant's conduct, and (c) which is likely redressed by the relief the plaintiff seeks. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Shanty Town Assocs. Ltd.*

*Partnership v. EPA*, 843 F.2d 782, 788 (4th Cir.1988); *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 937 (9th Cir.1987); *Choctaw Mfg. Co. v. United States*, 761 F.2d 609, 615 (11th Cir.1985). Each of these prongs is satisfied with a showing that a plaintiff is adversely affected by an agency action, when that plaintiff's requested relief is to set aside the very action by which the plaintiff was aggrieved.

10. Paraphrasing the Ninth Circuit's opinion in *Alaska Fish & Wildlife Federation,* Plaintiffs' Complaint reasonably can be inferred to allege that a decrease in the number of certain species in the Forests will cause harm to the environment. The harm will cause injury to those who wish to photograph, observe, or carry out scientific studies on these sensitive and endangered species. The Court finds that Plaintiffs' interests are significant, that they will be and have been adversely affected by Defendants' actions.

## D. Plaintiffs' APA Claims Based on Violations of the NEPA, NFMA, Regulations Thereunder, and Forest Plan

The Court now examines Plaintiffs' claims challenging Defendants' approval of these seven timber projects in the two National Forests. Plaintiffs filed claims under the Administrative Procedure Act ("APA") and seek preliminary injunctions pursuant to those claims. Under the APA, a plaintiff may seek judicial review of any final agency action found to be "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs claim that the Defendant Forest Service's actions are arbitrary and capricious and not in accordance with the law because Defendants' approvals of the timber projects violate, *inter alia*, NEPA, the NFMA, the regulations thereunder, and the Forest Plan for these two National Forests.

### 1. *Standard of Judicial Review Under Administrative Procedure Act*

■ Judicial review in this case is premised on the deferential "arbitrary and capricious" standard of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) & 706(2)(C). "Agency actions may be overturned only if they are (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2). In reviewing agency actions, this Court must hew to several well-established limitations. First, the agency's actions are presumed to be lawful and correct. Second, the agency's conclusions can be overturned only if arbitrary and capricious, giving due deference to the agency's expertise and judgment. Third, the agency's legal interpretations are controlling if they are reasonable with regard to statutes, and not plainly erroneous with regard to the agency's own regulations. *See Sierra Club v. Robertson*, 784 F.Supp. 593, 604 (W.D.Ark.1991). Plaintiffs bear the burden on all issues in this case. Plaintiffs must show that the agency's actions are arbitrary, capricious, or contrary to law, or their claims must fail. Defendants are entitled to judgment if Plaintiffs fail to

make a sufficient showing on an essential element of their case with respect to which they have the burden of proof. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883–84, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Absent proof of arbitrary action, the Court must assume that the agency has exercised its discretion appropriately. *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

### 2. *National Environmental Policy Act*

Under the National Environmental Policy Act ("NEPA"), a federal agency must prepare an Environmental Impact Statement for a major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In order to determine whether an Environmental Impact Statement must be prepared, the agency may first prepare an "environmental assessment," 40 C.F.R. §§ 1501.3, 1508.9 (1992), which one court has aptly described as a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement ... is necessary." *Cronin v. United States Dep't of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990). An environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact[;] ...." and "[s]hall include brief discussions of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

■ NEPA, in effect, places procedural, not substantive, requirements on federal agencies. NEPA does not require specific environmental results, but rather requires that federal agencies undertake various procedures in an effort to promote decisions made in consideration of the best interests of the environment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351

**1312**

(1989); *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Principally, NEPA requires that decisions regarding the environment be made on the relevant information and that the adverse environmental effects of the proposed action are adequately identified and evaluated. *Robertson,* 490 U.S. at 350, 109 S.Ct. 1835; *Strycker's Bay,* 444 U.S. at 227–28, 100 S.Ct. 497. This standard requires the Court to "ensure that an agency has taken the requisite hard look at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Greenpeace Action v. Franklin,* 982 F.2d 1342, 1350 (9th Cir.1992).[11]

If the Forest Service decides that an Environmental Impact Statement is not required because the proposed action, here the timber projects, will have no significant impact, the Forest Service reports that decision formally in a "finding of no significant impact," or "FONSI." 40 C.F.R. § 1508.13. The Forest Service issued a FONSI for each timber project in this case, along with a separate Decision Notice approving each timber sale. Since the Defendant Forest Service found each timber project had no significant impact on the environment, the Forest Service began the timber projects without an Environmental Impact Statement. It is the seven administrative "findings of no significant impact," which allowed the Forest Service

to avoid preparing an Environmental Impact Statement, that Plaintiffs contest.

■■■ The decision not to prepare an Environmental Impact Statement pursuant to NEPA is subject to the same "arbitrary and capricious" standard that applies in APA actions. *State of North Carolina v. Federal Aviation Admin.,* 957 F.2d 1125, 1128 (4th Cir.1992) (citations omitted). In order to apply this standard, the Court must determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). In the NEPA context, the Court is called upon to evaluate whether the agency has taken a "hard look" at the environmental consequences and to determine whether the agency's conclusion was based upon a reasonable judgment, informed by the relevant factors. *State of North Carolina v. Hudson,* 665 F.Supp. 428, 437 (E.D.N.C.1987), *aff'd,* 940 F.2d 58 (4th Cir.), *cert. denied,* 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992). In short, the Court is called upon to determine whether the Forest Service's "findings of no significant impact" for each of these seven timber projects are based on reasonable judgment, or are arbitrary and capricious, or otherwise not in accordance with law.

To make this determination, the Court next outlines the parties' contentions, and then examines the actual requirements imposed on the Forest Service by the National Forest Management Act, the regulations thereunder, and the Forest Plan adopted

11. While Count IV of Plaintiffs' Complaint alleges a claim under the National Environmental Policy Act, Plaintiffs do not seek preliminary injunctive relief pursuant to that Count. However, the Court still examines whether Defendants complied with NEPA because the National Forest Management Act requires that forest management plans are prepared and administered in accordance with NEPA. *See* 16 U.S.C. § 1604(g)(1); 36 C.F.R. § 219.12(a). Thus, under the National

Forest Management Act, Plaintiffs can challenge individual site-specific projects if those projects violate NEPA's dictates. *Oregon Natural Resources Council v. Lowe,* 836 F.Supp. 727, 729 (D.Or.1993) ("Individual site-specific projects must be evaluated for compliance with the requirements of NEPA...."). Also, several of Plaintiffs' arguments address concerns which fall under the ambit of NEPA and concerns which have been addressed by Defendants in their briefs.

for the Chattahoochee and Oconee National Forests.

### 3. *Parties' Contentions*

Plaintiffs contend that the NFMA, the regulations thereunder, and the Forest Plan for the Chattahoochee and Oconee National Forests require the Defendant Forest Service to do, inter alia, these three things: (1) maintain a diversity of plant and animal species in the Forests; (2) ensure the viability of existing native and desired non-native species already existing in the two Forests; and (3) collect and maintain current inventory data and quantitative data of existing plants and animals in the Forests so that the Forest Service can manage the Forests in a way that ensures the viability and diversity of the existing plant and animal species in the Forests. Plaintiffs emphasize that Defendants admit that they do not have, did not obtain, and do not maintain any past or current population or inventory data for the sensitive species in issue in the Chattahoochee and Oconee National Forests. Inventory or quantitative data about the sensitive species in these Forests does not exist forest-wide or by ranger district, compartment, or timber project area. Therefore, Plaintiffs assert that Defendants' summary conclusions (that these seven timber projects have no significant adverse impact on the diversity or viability of the sensitive species in these Forests) are not based on an informed judgment and are necessarily arbitrary and capricious. Plaintiffs also assert that the NFMA, the regulations thereunder, and the Forest Plan require the Defendants to collect and maintain "current inventory data" and "quantitative data" and that Defendants' approvals of these timber projects, without obtaining such data for the sensitive species existing in the timber project areas, are also contrary to law.

Defendants respond that they are not required by law to collect inventory or quantitative data about the sensitive species in the Forests and are not required to conduct any population trend analysis of sensitive species. Alternatively, Defen-

dants assert that they fulfilled their obligations under the NFMA and the Forest Plan by selecting twenty "Management Indicator Species" and gathering information about the twenty MIS species. Defendants emphasize that their decision to use the MIS methodology, as opposed to inventory or quantitative data or population trend analyses about the existing sensitive species in the Forests, is a reasonable judgment, is not arbitrary and capricious, or otherwise not in accordance with law. Defendants stress that the NFMA regulations sanction the use of MIS species to evaluate diversity.

However, in reviewing Plaintiffs' claims, the issue is not whether using the MIS species methodology is reasonable. Instead, the issues are: (1) whether Defendant Forest Service is required by law to collect population data and conduct population trend analyses in order to fulfill its obligations under the NFMA, the regulations thereunder, and the Forest Plan; and (2) if so, whether collection of information about the selected MIS species, as opposed to numerous sensitive species existing in these Forests and project areas, fulfills those obligations; and (3) if not, whether failure to collect any population or other quantitative data about the sensitive species renders the agency's decisions, finding no significant impact on the sensitive species, not in accordance with the law.

In addition, even if the NFMA, its regulations, and the Forest Plan do not affirmatively require that the Forest Service collect population data or do population trend analyses, the question then becomes whether the Forest Service's decisions that the seven timber projects have no significant impact on sensitive and endangered species, rendered without any population data or population trend analyses of the sensitive species, were arbitrary and capricious since an uninformed decision is an arbitrary decision. The Court proceeds to consider these issues.

### 4. NFMA and Regulations Require Defendant Forest Service to Keep Inventory and Quantitative Data

 The Court finds that the NFMA and the regulations thereunder require the Defendant Forest Service to collect inventory data, including quantitative data, about the species of plants and animals in these National Forests.

The National Forest Management Act ("NFMA") requires the Defendant Forest Service to develop and maintain forest management plans for each unit of the National Forest System. 16 U.S.C. § 1604(a). Under the NFMA, the Secretary of Agriculture is required to promulgate, and the Defendant Forest Service is required to comply with, regulations "which provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives...." 16 U.S.C. § 1603(g)(3)(B). NEPA regulations are made applicable to the NFMA in 16 U.S.C. § 1604(g)(1). Under regulations enacted pursuant to the NFMA, the Defendant Forest Service is required to provide for a diversity of plant and animal species in the Chattahoochee and Oconee National Forests, and to collect inventories, including quantitative data, about the existing plants and animals in the planning process in order to evaluate the effect of any Forest Service management activities (such as timber projects), as follows:

> Forest planning shall provide for *diversity of plant and animal communities* and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. *Inventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition.* For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices.

36 C.F.R. § 219.26 (emphasis supplied). The regulations also place an affirmative obligation on the Defendant Forest Service to maintain fish and wildlife habitats in a way that maintains viable populations of existing plants and animals.

> *Fish and wildlife habitats shall be managed to maintain viable populations of existing native and desired non-native vertebrae species in the planning area.* For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to ensure its continued existence is well distributed in the planning areas. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19 (emphasis supplied). Finally, the regulations require the Defendant Forest Service to maintain "current inventory data" of the plant and animal species and provide that this "may require that special inventories or studies be prepared."

> Each Forest Supervisor shall obtain and keep *current inventory data* appropriate for planning and managing the resources under his or her administrative jurisdiction. The Supervisor will assure that the interdisciplinary team has access to the best available data. *This may require that special inventories or studies be prepared.*

36 C.F.R. § 219.12 (emphasis supplied).

The NFMA also contains provisions specifically addressing certain management actions. For example, the NFMA imposes an affirmative obligation on the Defendant Forest Service to insure that timber clearcuts are carried out in a manner "consistent with the protection of soil, watershed, fish, wildlife ... resources" as follows:

> The Secretary shall promulgate regulations which "insure that clearcutting ...

and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System Lands only where such cuts are carried out in a manner *consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources,* and the regeneration of the timber resource."

16 U.S.C. § 1604(g)(3)(F)(v) (emphasis supplied).

In order to comply with its duties under the NFMA, the Forest Service has designated certain species as sensitive species and conducts BEs to determine the impact of timber projects on those sensitive species. The Forest Service Manual instructs the District Rangers to prepare BEs before any management action that might impact sensitive species is taken. The Forest Service Manual provides that the objective of the BE is to ensure that the Forest Service's actions, here timber sales, do not contribute toward the trend of the sensitive species becoming listed as federally endangered species as follows:

Objectives of the Biological Evaluation

1. To ensure that Forest Service actions do not contribute to loss of viability of any native or desired non-native plant or contribute to animal species or trends toward Federal listing of any species.

2. To comply with the requirements of the Endangered Species Act that actions of Federal agencies not jeopardize or adversely modify critical habitat of Federally listed species.

3. To provide a process and standard by which to ensure that threatened, endangered, proposed, and sensitive species receive full consideration in the decision making process.

Forest Service Manual § 2672.41.

Defendants respond that these requirements of monitoring population trends are limited to MIS species. While the requirements of monitoring population trends is limited to Management Indicator Species by 36 C.F.R. § 219.19(a)(6), the requirements of 36 C.F.R. § 219.12 requiring "current inventory data" and 36 C.F.R.

§ 219.26 requiring "quantitative data" have no such limitation. It is these later two regulations upon which Plaintiffs principally rely. In addition, the General Management Requirements in the Vegetative Management Environmental Impact Statement ("VMEIS") are expressly incorporated into the Forest Plan (as discussed at length in Section D(7) *infra*) and affirmatively require the Forest Service to collect population data about sensitive species of plants. The VMEIS expressly applies to sensitive species of plants and does not mention the MIS. VMEIS, Administrative Record, Part A, Tab 51.

In sum, the NFMA, the regulations thereunder, and the Forest Plan all require the Forest Service to collect and maintain population data about the species of plants and animals in the National Forests. Courts may examine whether an agency followed its own regulations. Here, the Defendant Forest Service did not. *Simmons v. Block,* 782 F.2d 1545, 1550 (11th Cir.1986).

**5. *Defendants' MIS concept, as applied to evaluate the impact of these seven timber projects on sensitive species in these Forests, does not satisfy NFMA, the regulations, or the Forest Plan***

■ Even if the Defendant Forest Service must maintain inventory and quantitative data about the existing species of plants and animals in the National Forests, the Defendant Forest Service emphasizes that it need have only the best inventory or quantitative information available to the Defendant Forest Service, as opposed to some ideal type of population data or population trend analysis as Plaintiffs suggest. The Defendants argue that the NFMA regulations simply do not specify the type of inventory or quantitative data, but rather mandate only that the Defendant Forest Service consult information adequate to determine what effects the proposed timber projects have on the diversity and

viability of existing plants and animals in the Forests.

In an attempt to show that they relied on adequate information, Defendants emphasize that they collect data on the twenty MIS species selected for these National Forests. Defendants contend that their collecting information on the twenty MIS species discharges their duty to collect inventory and quantitative data adequate to assess planning options (which would encapsulate effects on PETS species), and adequate to evaluate the viability and diversity of existing sensitive species in the National Forests. The Court disagrees for several reasons.

First, it does not appear from the administrative record that the Defendant Forest Service collected population data or conducted population trend analyses for even the twenty MIS species selected for the two Forests. The Defendant Forest Service prepares annual reports, entitled "Annual Forest Plan Monitoring and Evaluation Reports." (Appendix B). The reports do not appear to discuss the twenty MIS species except every three years. Even then, the discussion of whether the population of an MIS species is increasing or declining seems to be based primarily on the field surveys of Forest Service staff members during their preparation of BEs. Those field surveys do not include any inventorying of MIS species or collection of population data about any MIS species but mainly consist of spot checking to determine whether an individual member of a plant or animal species exists in the timber project area—not how many of that species exist. Indeed, much of the information in the annual reports about whether the population of an MIS species is increasing or decreasing is anecdotal and far from reliable quantitative or inventory data.

For example, the most recent review of the population trends of the twenty MIS species appears to be in the 1994 Annual Report (Appendix B, Tab 22, pp. 26–30) and the "1991 Five Year Review and Recommendations Report." (Appendix B, Tab 19, pp. 7–9). These reports do not reference any quantitative inventory collections or data regarding the majority of the twenty MIS species, but again appear to estimate in only a conclusory manner the population trends of the MIS. While the reports note that the populations of certain MIS species, such as Deer, Grey Squirrel, Turkey, Rainbow Trout, and Brown Trout are abundant and stable, the reports seem to indicate that the populations of at least one-half of the twenty MIS species are declining in these two Forests. For example, the 1994 report states that there are only a few sites with Bog Turtles, that the Purple Pitcher Plant remains at considerable risk, that the long term viability of the Brook Trout is a concern, and that the Indigo Bunting and Ruffed Grouse are in decline. The 1991 report indicates that Quail populations are low and erratic and that the Red–Cockaded Woodpecker is declining. The 1994 report adds that the red-cockaded Woodpecker is now critically endangered in the Oconee. While the populations of the MIS species are discussed in a summary manner in these reports, it still does not appear from the reports, or the administrative record generally, that the Forest Service has collected inventory or quantitative data about the majority of the twenty MIS species selected for these two Forests.

Even assuming *arguendo* that the Forest Service has some minimally adequate anecdotal information and spot field surveys, if not actual inventory or quantitative data, to estimate reasonably the population trends of the twenty MIS species, the Court finds that the MIS concept is a wildlife management scheme that reliably manages wildlife habitat and ecosystems in the Forests and measures biodiversity, but the MIS concept does not even attempt to measure or reasonably measure the population or long-term viability of any given sensitive species whose population is in serious decline—much less the viability or population trends of the 2,000 species of plants and 500 species of animals in the National Forests. This is especially true

under the particular facts here given the specific manner in which the MIS concept has been applied for these timber projects in these two Forests. The Court finds, based on the administrative record before the Court, that the twenty MIS species selected for these two Forests, and how the Forest Service monitors those twenty MIS species, does not reasonably, much less reliably, estimate the effects of these seven timber projects on the viability in the Forests of the specific sensitive and endangered species in issue for several reasons.

First, only four of the twenty species on the MIS list are sensitive or endangered species (Yellow Lady's Slipper, Pitcher Plant, Bog Turtle, and Brook Trout), and these four sensitive or endangered species (either individually or collectively) do not represent all of the required wildlife habitats of the many different sensitive species existing in the seven timber projects. While the Defendant Forest Service argues that other non-sensitive MIS species fill in the gaps and represent any missing similar habitats, this ignores the fact that the other non-sensitive MIS species with some of the same habitat requirements are not declining in population, but indeed are increasing in population. Thus, although a sensitive species in the timber project area and a non-sensitive MIS species may share similar habitats, the MIS concept, as applied to the facts here, does not examine or account for why one species with a similar habitat is increasing whereas yet another species is declining. Thus, the MIS theory, that the impact of timber projects on the selected MIS species represents the impact on all sensitive species, does not necessarily correlate when the represented species is a species with similar habitat but a declining population.

Furthermore, the Court recognizes that plants and animals coexist in communities defined by forest type, successional stage, habitat size, moisture regime, soil productivity, fire history, and numerous other environmental factors. The MIS concept is certainly an acceptable approach to "ecosystem management." The twenty MIS species may well act as ecological barometers in managing habitats in the Forests. Maintaining different habitats for species with quite different needs may indeed ensure a diverse mix of plants and animals. Also, when there is large number of habitats and species, interactions between them may be expected to be likewise rich and diverse. However, maintaining diversity of habitats and species through the MIS concept does not *ipso facto* address, much less ensure, viability of any given species within that mix of species. This is especially true for a given sensitive and endangered species, whose population is seriously declining. The MIS concept manages wildlife habitats but does not quantify or measure a species' viability.

Defendants also assert that even if the MIS concept does not measure the impact of a timber project on the viability of the impacted sensitive and endangered species in the Forests, this does not matter because the Defendant Forest Service submits it has no separate and distinct obligations or requirements for sensitive species, as opposed to any other species in the National Forests. This position misses the overall point of Plaintiffs' challenge to the Decision Notices' findings of no significant impact. The Defendant Forest Service has an admitted obligation to determine whether its management actions, here timber projects, will have a significant impact on the environment. In fulfilling its duties to manage the Forests, to maintain viability of existing species, and to determine whether a timber project has a significant impact, the Forest Service itself identifies the species in decline, labels them sensitive species, and then initiates the BEs and EAs to determine whether a timber project will have a significant impact on PETS species. The administrative record is replete with references to the Forest Service's admissions that it must determine the impact of the timber projects on the sensitive and endangered species in the National Forests before it can issue a Decision Notice on

the proposed projects. Thus, even the Defendant Forest Service itself identified this obligation to determine the impact on sensitive species within their duty of inquiry in their own BEs and EAs. The administrative record for these timber projects belies the Defendants' belated claims now that they had no obligation to collect data and make specific inquiry about sensitive and endangered species (as opposed to all species in general).

In any event, a number of courts have recognized the Defendant Forest Service's obligations to assess the impact of proposed actions on sensitive species in the National Forests. *See, e.g., Swanson v. U.S. Forest Service*, 87 F.3d 339, 344 (9th Cir.1996) (recognizing appropriateness of discussing effects on threatened, endangered, and sensitive species); *Oregon Natural Resources Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir.1995) (affirming grant of preliminary injunction judgment where agency failed to consider effect on sensitive species in an EIS); *Leavenworth Audubon Adopt–A–Forest v. Ferraro*, 881 F.Supp. 1482, 1487–88 (W.D.Wash.1995) (granting preliminary injunction where agency only summarily examined the effect of proposed action on a sensitive species); *Morgan v. Walter*, 728 F.Supp. 1483, 1489 (D.Idaho 1989). Failure to consider the effects of the proposed action on sensitive species has been found to be an abuse of discretion. *Marsh*, 52 F.3d at 1490; *Ferraro*, 881 F.Supp. at 1487–88; *Morgan*, 728 F.Supp. at 1489.

Defendants cite two cases in support of their position that the MIS concept, without separate population data about sensitive species in the Forests, reasonably estimates the impact of the timber projects on the viability and diversity of the sensitive and endangered species of plants and animals in issue in the Forests. However, neither case is on point. In *Krichbaum v. Kelley*, 844 F.Supp. 1107 (W.D.Va.1994), the plaintiff challenged the Forest Service's decision authorizing one timber project of even-age timber cutting on 114 acres in the George Washington National Forest because the Forest Service did not have adequate data to assess the effect of the timber projects *on diversity* in the Forest. *Id.* at 1114. The plaintiff challenged the adequacy of the Forest Service's data because the Forest Service did not maintain population inventories on every species in the Forest. *Id.* In response to the plaintiff's Freedom of Information Act request for such inventories, the Forest Service delivered to the plaintiff only the biological evaluations for each of the timber projects. *Id.*

The district court in *Krichbaum* rejected the plaintiff's challenge. The court found that the regulations promulgated under the NFMA do not require "detailed lists of the plant and animal contents of each management area." *Id.* Accordingly, the court endorsed the Forest Service's use of MIS species to evaluate *diversity*. In addition to the on-site biological evaluations performed for each timber project, the Forest Service compiled "area specific population data for various 'management indicator species' in the project area." *Id.* The court found that this approach "furnishe[d] more than enough of an 'inventory' to permit a reasoned evaluation of *diversity* under the NFMA." *Id.* (emphasis supplied).

*Krichbaum* is totally different from this case. First, none of the plaintiff's claims revolved around the Forest Service's obligation regarding sensitive species with declining populations. Second, in *Krichbaum*, the Forest Service compiled area-specific population data on the MIS species in the project area, whereas Defendants here did not collect any area-specific population data on the MIS species in the seven project areas in the instant case. Third, the *Krichbaum* court addresses the use of the MIS concept only as a tool to evaluate *diversity*. The court did not address whether use of the MIS concept provides adequate information to ensure species *viability*, especially viability of sensitive and endangered species in seven timber project areas. If anything, *Krichbaum* illustrates that the MIS concept manages wildlife habitats and evaluates diversity, not viability.

The second case Defendants cite is *Sierra Club v. Robertson*, 810 F.Supp. 1021 (W.D.Ark.1992), but *Robertson* involved a challenge to a timber management scheme (using even-aged management and herbicides) in the overall forest plan and did not involve judicial review of the impact of specific timber contracts. *Robertson* did not address either the MIS concept or the viability of sensitive species. Regarding the plaintiffs' claims of inadequate inventory information, the *Robertson* court found only that some of the plaintiffs' claims were unsupported and that others simply were incorrect. *Id.* As examples, the court noted several species that the Forest Service had inventoried where plaintiffs claimed they had not.

In sum, the Court first finds that Plaintiffs have shown a substantial likelihood of success on their claims that Defendants are required by law to collect and maintain population or quantitative data about sensitive and endangered species in the Forests, but have not done so. The Court also finds that the Defendants' twenty MIS species selected for these Forests, under the particular facts of this case, do not reasonably or reliably predict the impact of these seven timber projects on the many sensitive species in issue in these Forests. Alternatively, the Court is not required to determine finally whether the MIS concept does or does not reasonably predict the impact on sensitive and endangered species because, based on the record submitted to date, Defendants have not collected adequate current population or inventory data or current population trends data on all of the twenty MIS species in the Forest Plan for the Chattahoochee and Oconee National Forests. Thus, for several reasons, the Court finds that Defendants' BEs and EAs were prepared contrary to the requirements of NFMA, the regulations thereunder, and the Forest Plan. Therefore, the Court finds that Plaintiffs have shown a substantial likelihood of success on their claim that the Defendants' Decision Notices, in issuing findings of no significant impact and approving these timber projects without an Environmental Impact Statement, are contrary to law.

## 6. *"Findings of No Significant Impact" in Decision Notices Are Arbitrary and Capricious*

■ Even assuming *arguendo* the Defendant Forest Service is not required by law to collect or maintain population data on the twenty MIS species or the sensitive and endangered species in the Forests, the Defendant Forest Service must still have adequate facts and evidence on which to base its findings of no significant impact. After lengthy review of the administrative record, the Court finds that Plaintiffs have shown a substantial likelihood of success on their claims that Defendants' "findings of no significant impact" on the PETS species were arbitrary and capricious because they were, in effect, rubber stamps that came without adequate investigation or information whether these projects would significantly impact the diversity or viability of the sensitive species in the Forests.

Courts may review whether the Defendant Forest Service's action in approving a timber project without adequate information was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Leavenworth Audubon Adopt–A–Forest v. Ferraro*, 881 F.Supp. 1482 (W.D.Wash.1995). While this standard is narrow and presumes the agency action is valid, *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), it does not shield agency action from a "thorough, probing, in-depth review." *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479, 481–82 (W.D.Wash.1988). Also, an agency action will be set aside as arbitrary and capricious where the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Under an arbitrary and capricious standard of review, the Court cannot, and should not, substitute its judgment for that of the Defendant Forest Service's. Rather, the Court must review the administrative record and determine whether the Defendant Forest Service's FONSIs were reasonable. Necessarily, the Court's analysis focuses on the methodology employed by the Defendant Forest Service, the facts on which the Defendant Forest Service based its ultimate conclusions, and whether the conclusions reached by the Defendant Forest Service reasonably comport with the facts from which they are drawn. Again, whether the Court would reach a different conclusion based on the same given facts or evidence does not justify enjoining the Defendant Forest Service's actions. The Court can only enjoin the Defendant Forest Service's actions if the Defendant Forest Service's conclusions were not reasonably derived from the facts and evidence considered.

Given the facts of the present case, the Court has little difficulty in finding that such is the case here, because the Defendant Forest Service does not appear to have facts or evidence, whether population data, quantitative data, or any other type of adequate information, to support its findings of no significant impact. After thoroughly reviewing the BEs and EAs for the seven timber projects, the Court finds not that it necessarily disagrees with the Defendant Forest Service's conclusions, but rather that there simply is an insufficient basis for the Defendant Forest Service's conclusions. For starters, many of the important "facts" on which the Defendant Forest Service based its decisions appear to be assumptions, presumptions, or conclusions themselves—but not facts based on any evidence, documents, or data

in the administrative record. Secondly, the few facts the Defendant Forest Service includes in the administrative record for the seven projects do not support the Defendant Forest Service's summary findings, especially regarding sensitive species. If anything, the facts support findings of significant impact. And thirdly, the Defendant Forest Service's "investigation" of the impact of the timber projects on sensitive and endangered species was so superficial, conclusory, and inadequate to support the conclusions reached.

First, for each project the Forest Service did not sample the site for each sensitive species known to exist in the area, despite acknowledging its probable existence in the project site. The Forest Service not only does not have population data about the sensitive species (whether by project area, compartment, ranger district or forest wide), but also did not even determine whether all listed sensitive species exist in each of the seven timber project sites. The investigation performed with respect to many of the sensitive species constituted only a field trip to the project site where a staff member of the Defendant Forest Service took a "roll call" of all species present that day in the limited area of the field trip. Any species not there were marked "absent" and at times did not receive the benefit of further review. Based on this "investigation," the staff member preparing the BE would comment only that a sensitive species was not found in the project area and thus would not be impacted by the timber project. Neither the BE nor the "field surveys" indicate that the entire project site was "surveyed." Additionally, neither the BE nor the field survey indicated whether the fact that the species was not on the site during the field survey could have been due to some other reason that species did not exist on the site. Notably, some plant species are seasonal, and some animal species no doubt migrate from some parts of the Forest to others.[12] Simply concluding that a timber project will not

**12.** Moreover, the Court is mindful of the fact

that the reason the Defendant Forest Service

have any effect on a species because that species was not present on a given field trip to only part of the project site, with nothing more being done, is not a sufficient examination of the effects of the proposed timber project on the sensitive species existing in these National Forests.

Second, even though the Forest Service determined that many of the sensitive species in decline in the Chattahoochee and Oconee National Forests were found in the timber project sites and would be destroyed, the Forest Service determined in a conclusory manner that because the sensitive species also existed elsewhere in the Forests, then *ipso facto* these timber projects would not significantly impact their diversity or viability in the Forests. However, this conclusion is made without any inventory or population data regarding how many of the declining species exist elsewhere in the Forests and without knowing how many of the species are being destroyed in the project site. In short, there is no current or past population data or population data trends to evaluate, much less support, such a hypothesis. The Forest Service simply does not have any baseline population data for sensitive species in the Forest and does not have any quantitative data about the sensitive species (whether by project site, compartment, ranger district, or forest wide) from which to measure whether these seven timber projects (or any timber projects in the past or future for that matter) will significantly impact the viability of the sensitive species that continue to decline. Indeed, their decline may in part be due to prior timber projects but the Defendant

Forest Service has no information available to confirm or disprove that hypothesis either. As explained by the Plaintiffs' expert's affidavit, one simply cannot evaluate the impact on sensitive species without any quantitative data about that species. The Court is not suggesting that the Forest Service must inventory all sensitive species throughout the Forests. However, the lack of any population data for the majority of the sensitive species in the Forests does support, at a minimum, a finding that the Defendant Forest Service's conclusions (that these seven timber projects destroying individual sensitive species and 2,103 acres of suitable habitat for those species will not impact the already declining population of a sensitive species) are arbitrary and capricious conclusions.

More troubling are the occasions when the Defendant Forest Service notes the potential habitat for a particular sensitive or endangered species, does not sample the project area for the species, and still determines that the proposed timber project will have no effects on the species. In all fairness to the Defendant Forest Service, some of these findings are buttressed by anecdotal reports that the species never has actually been seen in the project area. In such situations, the Defendant Forest Service reasonably can assume that the species simply would not be in the project area at the time the harvesting would occur. Many of these findings about other species, however, are based on analyses that the Court cannot review for arbitrariness because the facts and the analyses are not contained, even briefly, in the administrative record.[13]

"surveys" the proposed project site and evaluates the effects of the proposed project on certain sensitive species is because the Defendant Forest Service determines that the habitat in the project area is suitable for that particular sensitive species.

**13.** The Eleventh Circuit frequently holds in a different context that actions of a district court cannot effectively be reviewed for an abuse of discretion if the district court does not explain why it employed its discretion to reach a specific result. This logic applies

here as well to this Court's reviewing of the Defendant Forest Service. *Head v. Medford,* 62 F.3d 351, 354 (11th Cir.1995) ("[T]he district court ... gave no reason for denying defendant's bill of costs. This was an abuse of the court's discretion."); *see also Gilchrist v. Bolger,* 733 F.2d 1551, 1557 (11th Cir.1984) ("The court must give a reason for its denial of costs so that the appellate court may have some basis upon which to determine if the trial court acted within its discretionary power.").

Even in the cases where the Defendant Forest Service staff person acknowledges the existence of sensitive species in a given project area, and acknowledges that the timber project inevitably would impact the species, the conclusion is always that "individual members of the species might be impacted, but viability in the Forests would not be threatened." The BEs all conclude with respect to such species that any effects "are not likely to result in a trend towards federal listing." While it is unclear on what basis these findings are made, it is clear on what basis they are not. They are not made on the basis of any population inventory on the sensitive species in the project area. They also are not made on the basis of any known population inventory data for the sensitive species in the Forests, or the Ranger Districts, or the Compartments. In sum, the BEs conclude that these sensitive species have a minimum number of reproductive members to ensure viability in the Forests without any facts and analyses anywhere in the administrative record to support such conclusions. Again, the Court cannot review the arbitrariness of the rationale or the judgment of the Defendant Forest Service without, at a minimum, an explanation of the facts or the basis on which the Defendant Forest Service's staff member, in his judgment, relied.

Finally, the Court notes the Defendant Forest Service's repeated use of "canned language" time and time again in the BEs and the EAs. Notwithstanding the fact that different biologists and interdisciplinary teams prepared each BE and EA, they somehow always reach the same results about sensitive species and employ the exact same language in reaching said results. The similarity of the language employed in all of the BEs and EAs strikes the Court as illustrative of the lack of facts, evidence, and analysis that the BEs and EAs are supposed to represent.

For example, all of the BEs and EAs contain the following statement regarding PETS species in the seven project areas: "Cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect [these sensitive or endangered] species." Notably, while the language is identical for all seven projects, none of the seven projects discusses any prior or reasonably foreseeable future actions. There is no baseline data, much less cumulative data, in the administrative record for these conclusions. Thus, even the omissions in the BEs and EAs for the seven timber projects are identical.

The following language also appears in all seven BEs or EAs: "The timber project area may impact only individual members of these species but is not likely to result in a trend to federal listing of any of these species under the Endangered Species Act, or a loss of viability on the forest." While this opinion can be expressed in a number of ways, all the BEs and EAs use the same language. The same is true of the following language which appears in all the BEs and EAs: "Potential habitat for [these species] may be present in the project area ..., but they were to found during the survey. Therefore, the proposed project will not impact these species." The uncanny way the language in each project's BE and EA mirror or parrot each other further undermines the conclusions they purport to support. When coupled with the lack of facts, evidence, or analysis discussed above, the Court has no basis to determine whether the identical language in each project is based on any facts, evidence, or analysis the Court could find reasonable. Without adequate facts, evidence, or analysis in the administrative record for the agency's conclusions, a court would have no alternative but to set aside the Defendant Forest Service's actions as arbitrary and capricious, an abuse of discretion, and contrary to law.

Finally, the BEs and EAs actually admit in many places that the timber projects will impact certain sensitive species. However, the answer to that significant impact is always a brief reference to "mitigation measures" will be taken. In other words, even though there will be significant impact, the FONSI finding is still

made based on the BE's or EA's statement that "mitigation measures" will be used to remove that significant impact. For example, the administrative record is replete with references to the fact that the Brook Trout, native to Georgia, exists in the timber project sites, is a sensitive species in serious decline in these Forests, and may be impacted by the significant tonnage of sediment from these timber projects. For example, the FY 1988 Monitoring of the Forest Plan Report indicates as follows:

> Brook Trout—The long-term fate of brook trout in the Forest is of concern. Wild brook trout are known to occur in only 85 miles of streams in the mountains.

Appendix B, Tab 13, p. 9. The 1991 annual monitoring report for the Plan also expresses concern about the Brook Trout as follows:

> The long-term viability of this species in the Forest is of concern. Distribution is limited to only 10–15 percent of the original range ...

Appendix B, Tab 18, p. 15. The 1994 annual monitoring report contains the exact same language:

> The long-term viability of this species in the Forest is of concern. Distribution is limited to only 10–15 percent of the original range ...

Appendix B, Tab 22, p. 29.

The BEs and EAs contain repeated reference to the two factors contributing to the decline of the Brook Trout: (1) introduction of Rainbow and Brown Trouts in the streams; and (2) sedimentation entering trout streams and increasing the water temperature. The BEs and EAs also acknowledge that these timber projects will introduce a substantial tonnage of sediment into the streams of the project areas and the Forests in general which may increase the water temperature and significantly impact Brook Trout. However, the BEs and EAs then all summarily conclude that the timber projects will have no significant impact on the viability of the already seriously declining Brook Trout because "mitigation measures" will be used

in the projects. Some BEs and EAs do not specifically discuss what and how this will be done but just use the term "mitigation measures" will be done. Some BEs or EAs do refer to the "Forest Land Management Standards and Guidelines" and the State's "Best Management Practices," which are rules and regulations about silt fencing and similar protection measures for logging and road construction. However, Plaintiffs introduced evidence about the timber projects in progress that showed that such mitigation measures were not in place and were not being enforced in the timber projects and that the projected sedimentation into the streams and rivers was occurring.

In addition, Plaintiffs contend that historically these mitigation measures are not enforced because there is an insufficient number of Forest staff members to monitor the actual timber harvesting and construction of logging roads, each of which contributes to the discharge of tons of sediments into the streams in the timber project areas. Although the discharge of these pollutants into the streams is not a "point source" governed by the requirements of the Clean Water Act, the discharge of sedimentation during these timber projects will significantly impact the viability of the Brook Trout in these mountain streams in the project areas. Even the Defendant Forest Service appears to admit that in its BEs and EAs, but then the Forest Service finds in a conclusory manner that "mitigation measures" will be taken to alleviate that significant impact. However, the past history presented by the Plaintiffs indicates that this does not occur and that these timber projects with logging roads do significantly impact the Brook Trout, as shown by their declining populations.

Finally, the Court also recognizes that Defendants contend that Forest Service staff biologists, ecologists, and botanists often consult with other experts and literature, and that Defendants assert that such third party information forms the reason-

able basis for their FONSI conclusions in the BEs and EAs. There is a section in each of the BEs and EAs which lists the names of experts and literature. However, there is also no indication when the listed experts were consulted, what the expert's opinions were, or any facts on which the experts relied in reaching their opinions. Also, none of the literature listed is included in the administrative record or the process record for any of the seven timber projects in order for anyone to review what it does or does not say. Neither the BEs nor the EAs discuss, with any level of depth, the articles cited. Instead, this literature is apparently still in books on someone's bookshelves.

In any event, none of this literature appears to have population or quantitative data on the twenty MIS species or the numerous sensitive species in issue in the Forests. Most of it relates to soil, air, and water issues, as opposed to sensitive and endangered species. Thus, none of this literature appears to support the Defendant Forest Service's casual, but repeated, conclusions that although individual members of the sensitive species may be impacted, the proposed action will not likely result in a loss of viability in the Forest or result in a trend to federal listing. Defendants' current emphasis on the literature listed in the BEs or EAs, but not contained in the administrative record or agency process record, seems similar to the post-decision justifications rejected by the court in *Leavenworth Audubon Adopt–A–Forest, etc. v. Ferraro,* 881 F.Supp. 1482, 1488 (W.D.Wash.1995).

If this is not a case where at least some quantitative or population data about sensitive and endangered species is needed, the Court is unsure what will ever be. To suggest that a sensitive species should be treated no differently than any other species not so designated (unless, of course, they are designated for even more protection, i.e., endangered or threatened) seems contrary to logic. While the Court is sympathetic to the Defendant Forest Service's position that the regulations do not require it to conduct population trend analysis for every species in the two Forests, the Court does not accept the full import of the Defendant Forest Service's argument that no quantitative data is ever required regarding the sensitive species in the Forests. This is especially true in this case where the Defendants have no past or present quantitative data or population data to support their often used and most sweeping conclusion in every BE and EA that the "cumulative effects from past, present, and reasonably foreseeable future actions will not adversely affect any of the sensitive or endangered species in this project area."

Indeed, the Defendant Forest Service admits that it is required to ensure the viability of the species in the two Forests. The Defendant Forest Service does not dispute that the NFMA regulations require, at least in some circumstances, inventory data and quantitative data. If quantitative data is required in some circumstances (which it is, otherwise the regulation would have no meaning), it would seem logical that such information is especially needed in circumstances where the Forest Service has determined these many sensitive species and habitats will be destroyed by the seven timber project sites.

In conclusion, for any number of reasons, the Court finds that, based on the administrative record to date, Plaintiffs have shown a substantial likelihood of success on their claims that the Defendants' Decision Notices, finding that these timber projects will have no significant impact on the already declining sensitive species and their suitable habitats in the Forests, are based on inadequate information and data and are arbitrary and capricious. An uninformed decision is an arbitrary decision.

**7. Vegetation Management Environmental Impact Statement Required by Forest Plan**

The Defendants' approval of the seven timber contracts is also contrary to law because Defendants failed to comply with the Vegetation Management Environmental Impact Statement ("VMEIS") for the Appalachian Mountains. The VMEIS,

*inter alia*, requires the Defendant Forest Service to consider adequate population data for proposed, endangered, threatened, or sensitive plant species as part of the site-specific analysis of a proposed management action, as follows:

> A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as Sensitive, is done as part of the site-specific environmental analysis. *This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. When adequate population inventory information is unavailable, it must be collected when the site has high potential for occupancy by a threatened, endangered, proposed, or sensitive species.*

VMEIS, Administrative Record, Part A, Tab 51. Plaintiffs correctly submit that the VMEIS affirmatively requires the Defendant Forest Service to collect population data on PETS plant species in the seven timber project areas.

The VMEIS for the Appalachian Mountains is incorporated by reference into the 1985 Forest Plan for these National Forests. *See* Administrative Record, Part A, Tab 51. Thus, the Defendant Forest Service must comply with the VMEIS, just as the Defendant Forest Service must comply with the Forest Plan. The NFMA and the regulations promulgated thereunder require that every site-specific decision made pursuant to the Forest Plan be consistent with the requirements of the Forest Plan. *See* 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."); 36 C.F.R. § 219.10(e) ("[T]he Forest Supervisor shall ensure that ... all outstand-

ing and future permits, contracts, cooperative agreements, and other instruments for occupancy and use of affected land are consistent with the plan. Subsequent administrative activities affecting such lands ... shall be based on the plan."); *see also Inland Empire Public Lands v. United States Forest Service,* 88 F.3d 754, 757 (9th Cir.1996) ("These site-specific projects must be consistent with the stage-one, forest-wide plan."); *Sierra Club v. Espy,* 38 F.3d 792, 795 (5th Cir.1994) ("Once an LRPM is in place ... [s]ite-specific analysis, sometimes referred to as compartment-level analysis, must be consistent with the LRMP."); *Sierra Club v. Robertson,* 28 F.3d 753, 755 (8th Cir.1994) ("The Forest Service must ensure that all projects are consistent with the plan."). To the extent the Defendant Forest Service does not comply with the VMEIS and thereby the Forest Plan, the Defendant Forest Service violates the NFMA and the regulations promulgated thereunder.

Defendants do not dispute that they are required to comply with the VMEIS. In footnote eight of the Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, the Defendants admit that the VMEIS has been incorporated into the Forest Plan and that all project decisions must be consistent with the Forest Plan. The Defendants argue only that they have substantially complied with the VMEIS.

In their first Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, the Defendants argue that the VMEIS does not require the Forest Service to do inventories unless the available information is inadequate. According to the Defendants, the VMEIS's requirement was never triggered because the Forest Service had adequate information. The Defendants listed several publications and resources that they feel constitute adequate information.[14] Notably, however,

---

14. The Forest Service contends it consulted the following sources: publications and information from the University of Georgia, the Wildlife Resource Division of Georgia, the

Natural Heritage Commission of Georgia, the Environmental Protection Department of Georgia, the Nature Conservancy of Georgia and of Tennessee, the Audubon Society, Trout

the Defendants do not contend that any of these publications or resources contain or have population data on sensitive species. In fact, the Defendants admit that they have no population data on the vast majority of the sensitive plant species in the Chattahoochee and Oconee National Forests. Defendants' arguments ignore the fact that express terms of the VMEIS refer to *"population inventory information."*

In their Supplemental Brief, the Defendants again argue that they have complied with the VMEIS. The Defendants assert that the VMEIS, by its own title and terms, does not require "population" inventories for the entire Forest, but instead as part of the site-specific analysis requires only a determination of how an action may affect any PETS plants species. The Defendants argue that they complied with this requirement when the Defendant Forest Service collected site-specific data and used "best available data" to evaluate the effects of the challenged projects in the respective BEs. The Defendants further attack Plaintiffs' VMEIS claim on two fronts. First, the Defendants emphasize that the VMEIS does not require population data for PETS plants species across the entire Forests, but rather only in the timber project area. While the Court concurs in the Defendants' reading of the VMEIS, it seems to represent a distinction without a difference on the facts presented here. The evidence shows that the Defendant Forest Service not only has no population data for the sensitive species in the entire Forests, but also has no population data for the sensitive species in the seven timber project areas.

Second, the Defendants contend that the true purpose of the VMEIS is to ensure that the Defendant Forest Service evaluates how a proposed action may affect any PETS plant species, and that the Defendant Forest Service has done this through collecting site-specific data and using the "best available" data in evaluating the effects of the timber projects in the BEs. Even assuming *arguendo* the Defendants correctly identify the overall purpose of the VMEIS, and that their actions further that overall purpose, this does not give the Forest Service authority to ignore the express requirements of the VMEIS.

The Court already has outlined the standard it must employ in reviewing the Defendant Forest Service's actions under the NFMA. The Court acknowledges that the Defendant Forest Service's actions should not be set aside unless they are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Resources Council*, 490 U.S. 360, 375–76, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). As a function of its review, however, the Court examines whether the Defendant Forest Service has scrupulously followed the law, and its own regulations. *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir.1986). While the Court affords the Defendant Forest Service deference in interpreting its own regulations, *see Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991); *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), the Defendant Forest Service's interpretation

Unlimited, Quail Unlimited, Grouse Society, the Tennessee Valley Authority, the U.S. Fish and Wildlife Service, and the U.S. Park Service. The Forest Service also contends it consulted the following books: The Mammals of Georgia, Vascular Flora of the Carolinas, Guide to Southern Trees, and The Land Manager's Guide to the Birds of the South. Finally, the Defendants note that the Forest Service drew on surveys and studies that it conducted, including nation-wide surveys,

site-specific studies for the BEs, and the Continuous Inventory of Stand Condition, which includes an inventory of trees and shrubs and their approximate age in each compartment of the Forest. However, the Defendants do not contend that any of this information contains population data or population inventories regarding the sensitive species of plants in these Forests. Also, none of this information is in the administrative record before the Court.

must be set aside if an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 114 S.Ct. 2381, 2386–87, 129 L.Ed.2d 405 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)).

The plain language of the NFMA and the regulations promulgated thereunder require that all site-specific decisions made under the Forest Plan be consistent with the Forest Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e); *see also Sierra Club v. Robertson*, 28 F.3d 753, 759 (8th Cir.1994) ( "[P]ersons may [bring an action asserting] that that proposed site-specific action is not consistent with the Plan, or that the Plan as it relates to the proposed site specific action is inconsistent with the governing statutes, or both."). Further, the plain language of the VMEIS, incorporated into the Forest Plan, requires *population* inventory information to be collected when adequate *population* inventory information is unavailable. To hold, as Defendants suggest, that other types of information is an adequate substitute for population data, would render the population data requirement of the VMEIS meaningless.

In sum, the VMEIS expressly requires the consideration of population data for sensitive plant species during the biological evaluation of each project site. Notwithstanding all of the information the Defendant Forest Service consulted, whether adequate to assess viability or not, the Defendant Forest Service did not consult, did not have, and did not collect any *population inventory data* for the sensitive species. In that regard, the Defendant Forest Service violated the terms of the VMEIS and *a fortiori* the Forest Plan. The Court finds that the Plaintiffs have shown a substantial likelihood of success on their claims that the Defendant Forest Service's Decision Notices and Findings of No Significant Impact regarding the seven timber projects were not in accordance

with law because the Defendant Forest Service did not comply with the requirements of the VMEIS, as required by the Forest Plan and the NFMA.

### E. Irreparable Harm

Defendants argue that any harm Plaintiffs might suffer is not irreparable. The Court disagrees for the reasons outlined in the May 8, 1996 Order.

■ The question of irreparable injury does not focus on the significance of the injury, but rather whether the injury, irrespective of its gravity, is *irreparable* —that is, whether there is any adequate remedy at law for the injury in question. *See Northeastern Fla. Chapter v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

■ In the instant case, the logging will destroy certain sensitive plants and animals located in the timber project areas, as well as suitable habitats for these and other similar sensitive and endangered species in the two Forests. No monetary award can recompense this injury; thus, there is no adequate remedy at law for these injuries.

### F. Balancing Of Harms Favors Issuing a Preliminary Injunction in this Case

■ Defendants contend that any interests Plaintiffs may assert in this litigation are outweighed by Defendants' competing interests. Namely, Defendants assert that an injunction in this case will interfere with the Defendant Forest Service's ability to manage the forests and their duty to harvest timber from the Forests. However, the Court finds that this interest is outweighed by

the environmental interest in maintaining the viability and diversity of the plants and animals in the National Forests.

The Court finds that the Forest Service will suffer little, if any, harm if an injunction should issue in this case. The timber harvested in the Southern Appalachian national forests constitutes less than 1% of the timber harvested in the five state region. Also, the timber at issue here is only a small percentage of that less than 1%. Thus, any affect on the Defendants' ability to manage the forests and ability to harvest timber is *de minimis* and is outweighed by the irreparable harm discussed above that Plaintiffs will suffer if an injunction does not issue.

Moreover, only three of the seven projects (representing four sale contracts) have been awarded and logging has begun under only two of those four contracts. In addition, Defendants' timber contracts contain an express provision which allows Defendants unilaterally to suspend execution of the timber contracts under a number of situations, as follows:

Seller may, by written notice, terminate this contract when it is in the best interest of Seller (as the Government) to do so, and for any of the following reasons:

(a) for the protection of Cultural Resources;

(b) for habitat protection of Threatened and Endangered Species;

(c) to avoid serious environmental damage if the Chief of the Forest Service determines such could result from Purchaser's operations;

(d) if the contract is significantly inconsistent with land management plans adopted or revised in accordance with Section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended;

(e) to comply with a court order, upon determination that the order would be applicable to the conditions existing on this sale;

(f) by agreement with Purchaser, upon Seller's determination that such termination is to the advantage of the Government, or not prejudicial to its interests.

Timber Contract, Plain.Exh. D. Thus, Defendants and the Intervenors anticipated the possibility of situations arising which may affect the execution of the timber contracts and, therefore, are not harmed significantly thereby. The anticipation of interruptions in the execution of the contracts was especially acute in this case where these same Plaintiffs have objected to the award of these particular timber contracts throughout the two to three year administrative processes for these timber contracts. Throughout the administrative processes, Plaintiff repeatedly made the same objections about the lack of adequate population data or other information to evaluate reasonably the impact of these timber projects on sensitive and endangered species and the need for an Environmental Impact Statement to be done.

As for Defendants' timber contracts yet to be awarded, Defendants will suffer very little, if any, harm if the timber contracts are enjoined. For reasons discussed above, the Court finds that minimal harm will occur from enjoining Defendants' timber contracts.

While the Court recognizes the financial burden the Defendants and Intervenors will suffer as a result of the injunction, the likely irreparable environmental harm is grave when compared to the adverse monetary impact involved. The Court is sympathetic to the plight of the Intervenors especially. Nevertheless, the timber sales must be enjoined until the Defendant Forest Service has taken the requisite "hard look" at the impact of the timber sales on the sensitive and endangered species in the project areas and the suitable habitats for such species in the project areas and ensured that the sales comply with the NFMA, the regulations thereunder, and the Forest Plan.

The Court finds that Plaintiffs have shown that a balancing of interests supports granting a preliminary injunction in this case.

### G. Public Interest Favors Issuing a Preliminary Injunction in this Case

Defendants also argue that the public interest dictates that no preliminary injunction should issue in this case. Specifically, Defendants contend that the award of timber contracts contributes to the local economy and that enjoining the sale of timber will affect the regional timber supply. However, the Court notes that the sales here are all allegedly below-cost timber sales. Thus, the impact of the sales on the local economy is less than the tax dollars expended by the Forest Service in granting the sales and reforestation.

Also, to the extent the award of timber contracts does contribute to the local economy, this interest is outweighed by the public interest in preserving vital aspects of the environment. Once the trees in the National Forests are logged, and the habitats for sensitive plants and animals destroyed, they will take years to grow back. Moreover, the individual sensitive plants and animals that will be killed cannot be replaced. Additionally, the public has an interest in preventing Defendants from acting in a manner inconsistent with the applicable law.

As for Defendants' and Intervenors' contention that halting the sale of timber will affect the regional timber supply, the Court notes that the timber harvested in Southern Appalachian national forests represents less than 1% of the total cut from the five-state region. Further, the timber sales involved here represent only a small portion of that less than 1%. Accordingly, the Court finds that public interest favors the issuing of a preliminary injunction in this case.

### III. *CONCLUSION*

The Court GRANTS Plaintiffs' Motion for a Preliminary Injunction [3–1, 3–2] for the following reasons:

(1) There is a substantial likelihood that Plaintiffs will ultimately prevail on the merits of Plaintiffs' claims that Defendants are violating the National Environmental Policy Act and the National Forest Management Act, the regulations thereunder, and the Forest Plan adopted for the Chattahoochee and Oconee National Forests;

(2) Plaintiffs will suffer irreparable injury if the injunction is not issued;

(3) The threatened injury to the Plaintiffs outweighs the potential harm to the Defendants and Intervenors;

(4) The injunction would not be adverse to the public interest.

**IT IS HEREBY ORDERED,** in regards to only the seven Chattahoochee–Oconee National Forests timber projects named Dunaway Gap, Tibbs Trail, Upper Swallows Creek, Compartment 05, Compartment 59, Big Net, and South Corn Ridge, that Defendants and Intervenors:

(a) cause the cessation of all timber-cutting and road-building activities from this date continuously until further Order of the Court;

(b) not permit the commencement or continuation of those activities from this date continuously until further Order of the Court; and

(c) not offer any of those projects that are unsold up for sale from this date continuously until further Order of the Court.

This injunction applies to Defendants and Intervenors, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert with them who receive actual notice of this Order. This injunction will remain in effect continuously until further Order of the Court.